MANUFACTURERS GAS AND OIL COMPANY ET AL. *v.* THE INDIANA NATURAL GAS AND OIL COMPANY.

[No. 19,263. Filed June 28, 1900. Rehearing denied Nov. 23, 1900.]

MINES AND MINERALS.—*Natural Gas.—Property Rights.—Increasing Natural Flow.—Injunction.*—Natural gas in the ground is so far the subject of property rights in the owners of the superincumbent lands, that, while each of them has the right to bore or mine for it on his own land, and to use such portion of it as, when left to the natural laws of flowage, may rise in the wells of such owner and into his pipes, no one of the owners of such lands has the right, without the consent of all the other owners, to induce an unnatural flow into or through his own well, or to do any act with reference

to the common reservoir, and the body of gas therein, injurious to, or calculated to destroy it, and an action may be maintained by the owners of superincumbent lands to enjoin another owner from using devices for pumping, or any other artificial process, that shall have the effect of increasing the natural flow of gas.

From the Grant Circuit Court.    *Reversed.*

*Rollin Warner, A. W. Brady* and *W. A. Ketcham,* for appellants.

*W. O. Johnson, M. Winfield, Foster Davis, J. C. Black-lidge, C. C. Shirley* and *Conrad Wolf,* for appellee.

DOWLING, J.—In this suit the appellants sought to enjoin the appellee from using devices for pumping, and from employing any other artificial process or appliance for the purpose, or having the effect of increasing the natural flow of gas from the wells of the appellee, or through the pipes conveying and transporting the same.

The ruling of the court sustaining a demurrer to the complaint is the error assigned.

The appellants, the Manufacturers Gas and Oil Company, the Manufacturers Fuel Company, the Ball Brothers Glass Manufacturing Company, the Swayzee Glass Company, the Crystal Window Glass Company, and the Alexandria Window Glass Company, are corporations organized under the laws of this State, as is also the appellee, the Indiana Natural Gas and Oil Company. The complaint states that the two corporations first named are engaged, among other things, in supplying natural gas to manufacturing companies carrying on business at Muncie, Delaware county, Indiana, in which large amounts of capital are invested, and by whom 1,600 men are employed and paid, the value of the annual output of which is $3,500,000; that the pipe lines of the said Manufacturers Gas and Oil Company extend to, and some of its wells are situated at, a point about nine miles northwest of the city of Muncie, and fifteen miles from one of the lines and from some of the wells of the appellee in Grant county; that the pipe lines and

some of the gas wells of the Manufacturers Fuel Company extend north from the city of Muncie about seven miles to about eighteen miles from the lines and wells of the appellee; that the Ball Brothers Glass Manufacturing Company has an annual output of $1,500,000, and that it employs 1,200 men, with a pay-roll of $42,000 per month; that the lines through which it is supplied with gas extend north from the city of Muncie about eleven miles to within a distance of about eighteen miles of the lines and wells of the appellee. Similar allegations are made as to the Swayzee Glass Company, the Crystal Window Glass Company, and the Alexandria Window Glass Company. It is further stated that each of the said manufacturing establishments requires a large quantity of fuel to enable it to carry on its operations; that natural gas is more desirable than any other kind of fuel, and that the plants of the said appellants were located and built especially with reference to the supply of natural gas in their vicinity, and are entirely dependent upon it. It is alleged that the appellee is engaged in the business of mining, collecting, and transporting natural gas from the natural gas fields in Indiana to the city of Chicago, in the state of Illinois, and that in the conduct of its said business it has established pipe lines for the transportation of natural gas through a great part of the counties of the State from Howard county to the northwestern boundary of the State, and that for the purpose of transporting such natural gas it has established, and is maintaining, one pumping station in the county of Jasper, and one in the county of Howard, and that it is intending and threatening, and, unless restrained by the court, it will establish another in the county of Grant, where it has located and drilled wells, and laid pipe lines connecting with its main pipe line to Chicago.

That, underlying the counties in the northeastern and central part of Indiana, there was discovered, in the year 1886, a great reservoir of natural gas, located in the Trenton

rock, at various distances from the surface of the earth, the counties of Delaware, Madison, and Grant, being located over the center of said reservoir, and said reservoir extending in every direction from the three counties aforesaid, and underlying the whole of Blackford, and parts of Jay, Wells, Howard, Tipton, Hamilton, Hancock, Henry, and Randolph counties, the supply of gas being greatest in the counties of Delaware, Grant and Madison; that said reservoir of natural gas is single, continuous, connected, and limited, situated in the Trenton rock underlying said several counties, and parts of counties, at a depth of from 900 to 1,000 feet below the surface of the earth; that the said Trenton rock is a porous substance which permits the passage of natural gas through it; that said gas is confined in said rock at a great pressure, which has diminished from 325 pounds in 1886 to 165 pounds at the present time; that because the said reservoir is continuous, connected, and limited, any diminution, waste, destruction, or injury to any part of said reservoir decreases the entire supply of natural gas, and diminishes the pressure of all natural gas wells drawing from said reservoir, thereby injuring all other parts of the said reservoir; that beneath and around said reservoir is a vast body of salt water, which also is confined, and is subject to great pressure, and which, as the pressure on said reservoir of natural gas decreases, or is diminished, constantly tends to enter the said reservoir, and the wells drilled therein, and to destroy the same; that when the pressure within the said reservoir shall decrease to about 100 pounds, the effect will be to permit said body of salt water to enter said entire reservoir, and to destroy the same, with all the natural gas wells entering therein, or drawing thereon; that the gas wells of the appellants will be rendered entirely useless and worthless if the said reservoir is destroyed; that for this reason it is of the utmost importance to the appellants, and to all other manufacturing institutions in said gas districts, that no excessive, un-

authorized, or unlawful use of said natural gas be made or permitted; that the appellee has located, and drilled, and draws natural gas from, a great number of natural gas wells in Grant and Howard counties, and has leased many thousands of acres of land in said Grant and Delaware counties, whereon it has not yet drilled wells, but it expects, intends, and gives out that it will drill gas wells on said lands; that much of the land so leased, for the purposes aforesaid, lies in the immediate vicinity of the said wells owned by the appellants, respectively; that all of said wells already drilled by the appellee penetrate to, and draw from, said reservoir of natural gas, and all wells hereafter drilled upon said leased land will penetrate, and draw upon, the said reservoir; that the appellee, in violation of the rights of the appellants, and in violation of section two of an act entitled "An act to regulate the mode of procuring, transporting, and using natural gas, and declaring an emergency," which became a law by lapse of time, without the Governor's approval, March 4, 1891, has used, is using, and threatens to continue to use, artificial processes, or appliances, for the purpose, and which have the effect of increasing the natural flow of the natural gas from its wells through the pipes used for conveying and transporting the same, by maintaining and using at points in the counties of Jasper, Howard, and Grant, pumping stations, and other devices to the appellants unknown, by which the natural gas while being transported is forced into its mains and pipes at a pressure of 400 pounds to the square inch, and largely beyond the natural rock pressure of the natural gas at the wells; that by the use of such devices the back pressure upon the reservoir, which is essential to keep the salt water from entering the wells, and destroying the natural gas, is withdrawn, and the flow of gas from the wells, and in the pipes, is greatly increased, and the supply and pressure of gas in the reservoir greatly diminished, to the prejudice of the appellants, and of all

other manufacturing interests in and throughout the said district; that in so forcing the gas through such pipe lines by such artificial processes, the appellee has drawn, and is continuing to draw, so heavily through its said wells upon the said reservoir as seriously to diminish the supply and pressure of gas therein, and to draw from the wells owned by the appellants and other manufacturers in said district the supply of gas upon which they are dependent for their continued operation; that, unless the appellee is restrained from piping said natural gas by pumping and other artificial appliances for the purposes and having the effect of increasing the natural flow of gas from any well, and of increasing and maintaining the flow of natural gas through the pipes used for conveying and transporting the same, the appellants and all other manufacturing interests located in the said gas district will suffer irreparable injury, their said wells will be wholly destroyed, and rendered entirely worthless, the value of their property will be destroyed in whole or in part, and they will be compelled to close down, and discharge their employes until such time as they can refit and reëstablish their plants for the use of coal, and that even then the value of their property will be greatly diminished, etc.

The relief demanded is, that the appellee be perpetually enjoined and restrained from using devices for pumping, or any other artificial process or appliance, for the purpose or that shall have the effect of increasing the natural flow of natural gas from any of its wells, and from increasing and maintaining the flow of natural gas through the pipes used for conveying and transporting the same.

The sufficiency of the complaint, and the right of the appellants to an injunction, are denied by the appellee, and the grounds relied upon by appellants for relief are vigorously assailed.

Counsel for appellee contend (1) that while natural gas in the ground may not be susceptible of absolute private

ownership, or the subject of ordinary property rights, yet, when brought to the surface and placed in pipes for transportation, it becomes private property, and an article of commerce; that all rights in, to, and over it, as such property, are entitled to the same measure of protection as is granted to the owner of oil, coal, or wheat on the cars; and that the State has then no right to prohibit or restrict its use, sale, or transportation; (2) that the Supreme Court of this State, having recognized natural gas when brought to the surface of the earth and placed in pipes as private property and a commercial commodity, and the appellee having invested its means upon the faith of those decisions, the appellants are precluded by the doctrine of *stare decisis* from the relief they seek, even if those decisions should now be regarded as erroneous, and overruled; (3) that, if the acts of 1889 and 1891 should be held valid, and the former decisions construing them overruled, a court of equity cannot now grant relief by way of injunction, because of *laches* on the part of the appellants; (4) that the appellants show no such individual interest or dominant right in the natural gas while in the ground, nor any such special injury different from the injury to the public, as will authorize them to maintain this action; (5) that the appellants do not show clearly their right in the *res,* that such right has been invaded, or is threatened, and that their right is dominant and superior to that of the appellee, and (6) that under the acts of the legislature, which have been held valid, and under the decisions of the Supreme Court of this State, in reference to the act which was held invalid, it has been settled that gas, when mined, is the property of the person producing it, and that the legislature cannot prohibit its sale or purchase within or beyond the State.

Whatever pertinence and force the *first, second, third,* and *sixth* objections, and the arguments founded upon them, might have if the grievance complained of was the transportation and sale of natural gas beyond the State by the ap-

pellee, they cannot be regarded as important or influential in the present case, for the reason that such transportation and sale are not the grounds of the action. The wrongful act stated, and sought to be enjoined, is the use by the appellee of pumping machinery, and other appliances for the purpose, and having the effect, of increasing the flow of gas from its wells into its pipes. The question to be determined here is not whether natural gas, when reduced to possession, is property, but as to the right of well owners to use certain extraordinary means to reduce it to possession.

In the examination of the subject, it is proper and necessary to consider whether the appellants have, or can have, a property interest in natural gas while in the earth, and before it is reduced to possession; whether the appellants will sustain a special injury by the threatened acts of the appellee different from the injury to the public; and whether the acts of the appellee invade an equitable right of the appellants.

Natural gas is a fluid mineral substance, subterraneous in its origin and location, possessing, in a restricted degree, the properties of underground waters, and resembling water in some of its habits. Unlike water, it is not generally distributed, and, so far as now understood, it can be used for but few purposes, the most important being that of fuel. Its physical occurrence is in limited quantities only, within circumscribed areas of greater or less extent.

If it could be dealt with as subterranean waters, there would be little difficulty in determining the rules by which the rights of landowners, and other persons interested in it, should be governed. But the difference between natural gas and underground waters, whether flowing in channels or percolating the earth, is so marked that the principles which the courts apply to questions relating to the latter are not adapted to the adjustment of the difficulties arising from conflicting interests in this new and peculiar fluid.

Natural gas being confined within limited territorial

areas, and being accessible only by means of wells or openings upon the lands underneath which it exists, is not the subject of public rights in the same sense, or to the same extent, as animals *ferae naturae,* and the like, are said to be. Without the consent of the owner of the land, the public cannot appropriate it, use it, or enjoy any benefit whatever from it. This power of the owner of the land to exclude the public from its use and enjoyment plainly distinguishes it from all other things with which it has been compared, in the use, enjoyment and control, of which the public has the right to participate, and tends to impress upon it, even when in the ground in its natural state, at least in a qualified degree, one of the characteristics or attributes of private property. In the case of animals *ferae naturae,* fish, and the like, this public interest is said to be represented by the sovereign or State. So, in the case of navigable rivers and public highways, the State, in behalf of the public, has the right to protect them from injury, misuse, or destruction. But in the case of natural gas, there are reasons why the right to protect it from entire destruction while in the ground should be exercised by the owners of the land who are interested in the common reservoir. From the necessity of the case, this right ought to reside somewhere, and we are of the opinion that it is held, and may be exercised, by the owners of the land, as well as by the State. Natural gas in the ground is so far the subject of property rights in the owners of the superincumbent lands, that while each of them has the right to bore or mine for it on his own land, and to use such portion of it as when left to the natural laws of flowage may rise in the wells of such owner and into his pipes, no one of the owners of such lands has the right, without the consent of all the other owners, to induce an unnatural flow into, or through, his own wells, or to do any act with reference to the common reservoir, and body of gas therein, injurious to, or calculated to destroy it. In the case of lakes, or flowing streams, it cannot be said that any

particular part, or quantity, or proportion of the water in them belongs to any particular land or riparian owner, each having an equal right to take what reasonable quantity he will for his own use. But the limitation is upon the manner of taking. So, in the case of natural gas, the manner of taking must be reasonable, and not injurious to, or destructive of, the common source from which the gas is drawn. The right of each owner to take the gas from the common reservoir is recognized by the law, but this right is rendered valueless if one well owner may so exercise his right as to destroy the reservoir, or to change its condition in such manner that the gas will no longer exist there.

This view of the law is sustained by the recent decision of the Supreme Court of the United States in the case of *Ohio Oil Co.* v. *State of Indiana,* 177 U. S. 190, 20 Sup. Ct. 576, 44 L. ed. 729. In that opinion, the court say: "Although in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil, until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. It is also clear from the Indiana cases cited that, in the absence of regulation by law, every owner of the surface within a gas field may prosecute his efforts and may reduce to possession all or every part, if possible, of the deposits without violating the rights of the other surface owners.

"If the analogy between animals *ferae naturae* and mineral deposits of oil and gas, stated by the Pennsylvania court and adopted by the Indiana court, instead of simply establishing a similarity of relation, proved the identity of the two things, there would be an end of the case. This follows because things which are *ferae naturae* belong to the 'negative community'; in other words, are public things,

subject to the absolute control of the State, which, although it allows them to be reduced to possession, may, at its will, not. only regulate but wholly forbid their future taking. *Geer* v. *Connecticut,* 161 U. S. 519, 525. But whilst there is an analogy between animals *ferae naturae* and the moving deposits of oil and natural gas, there is not identity between them. Thus, the owner of land has the exclusive right on his property to reduce the game there found to possession, just as the owner of the soil has the exclusive right to reduce to possession the deposits of natural gas and oil found beneath the surface of his land. The owner of the soil cannot follow game when it passes from his property; so, also, the owner may not follow the natural gas when it shifts from beneath his own to the property of some one else within the gas field. It being true as to both animals *ferae naturae* and gas and oil, therefore, that whilst the right to appropriate and become the owner exists, proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things *ferae naturae* all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No devesting of private property under such a condition can be conceived, because the public are the owners, and the enacting by the State of a law as to the public ownership, is but the discharge of the governmental trust resting in the State as to property of that character. *Geer* v. *Connecticut, supra.* On the other hand, as to gas and oil, the surface

proprietors within the gas field all have the right to reduce
to possession the gas and oil beneath.   They could not be
absolutely deprived of this right which belongs to them
without a taking of private property.   But there is a coequal
right in them all to take from a common source of supply
the two substances which, in the nature of things, are united,
though separate.   It follows from the essence of their right,
and from the situation of the things as to which it can be
exerted, that the use by one of his power to seek to convert
a part of the common fund to actual possession may result
in an undue proportion being attributed to one of the pos-
sessors of the right, to the detriment of the others, or by
waste by one or more, to the annihilation of the rights of the
remainder.   Hence it is that the legislative power, from
the peculiar nature of the right, and the objects upon which
it is to be exerted, can be manifested for the purpose of pro-
tecting all the collective owners, by securing a just distribu-
tion, to arise from the enjoyment by them of their privilege
to reduce to possession, and to reach the like end by prevent-
ing waste.   This necessarily implied legislative authority is
borne out by the analogy suggested by things *ferae naturae,*
which, it is unquestioned, the legislature has the authority
to forbid all from taking, in order to prevent them from
undue destruction, so that the right of the common owners,
the public, to reduce to possession may be ultimately effi-
caciously enjoyed.   Viewed, then, as a statute to protect or
to prevent the waste of the common property of the surface
owners, the law of the State of Indiana, which is here at-
tacked because it is asserted that it devested private property
without due compensation, in substance, is a statute pro-
tecting private property and preventing it from being taken
by one of the common owners without regard to the enjoy-
ment of the others.   Indeed, the entire argument, upon
which the attack on the statute must depend, involves a
dilemma which is this: If the right of the collective owners
of the surface to take from the common fund, and thus re-

duce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them, in and to the substances contained in the common reservoir of supply, then as a necessary result of the right of property, its indivisible quality, and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement, the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the fourteenth amendment, and this although it be that, if regulation cannot be exerted, one property owner may deprive all the others of their rights, since his act in so doing will be *damnum absque injuria.* This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States. * * *

"In view of the fact that regulations of natural deposits of oil and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by the Supreme Court of Indiana, is ultimately but a regulation of real property, they must hence be treated as relating to the preservation and protection of rights of an essentially local character. Considering this fact and the peculiar situation of the substances, as well as the character of the rights of the surface owners, we cannot say that the statute amounts to a taking of private property, when it is but a regulation by the State of Indiana of a subject which especially comes within its lawful authority."

The surface proprietors have the right to reduce to pos-

session the gas found beneath. They could not be *absolutely* deprived of this right without a taking of private property. But there is a coequal right in all of such owners to take the gas from the common source of supply. The use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of others. From these considerations, the Supreme Court of the United States held that the legislature derived the power to protect all the collective owners, by securing a joint distribution, to arise from the enjoyment by them of their privilege to reduce to possession. It declares the act of 1893 to be a statute protecting *private property,* and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. A right of property in all the surface owners in the gas contained in the common reservoir of supply is recognized, as is also the constitutional legislative authority to protect the right of property from destruction. The final conclusion of the court is that one common owner of the gas in the common reservoir can not devest all the others of their rights without wrongdoing.

The acts of 1891 and 1893 are an express recognition by the legislature of the qualified ownership of the common owners in the gas in the common reservoir, and any act therein forbidden may be, according to the circumstances, the subject of a suit at law, or a proceeding in equity, by the person injured, as well as the foundation of a public prosecution. Independently, however, of any statute, for the reason already stated, the common owners of the gas in the common reservoir, separately or together, have the right to enjoin any and all acts of another owner which will materially injure, or which will involve the destruction of the property in the common fund or supply of gas. Acts 1893, p. 300; *State* v. *Ohio Oil Co.,* 150 Ind. 21; *Del Monte Min. Co.* v. *Last Chance Min. Co.,* 171 U. S. 55, 60, 18 Sup. Ct.

895, 43 L. ed. 72; *Brown* v. *Spilman,* 155 U. S. 665, 15 Sup. Ct. 245, 39 L. ed. 304; *Jamieson* v. *Indiana Natural Gas & Oil Co.,* 128 Ind. 555, 12 L. R. A. 652; *Townsend* v. *State,* 147 Ind. 624, 62 Am. St. 477, 37 L.. R. A. 294; Acts 1891, p. 89; *Hibberd* v. *Slack,* 84 Fed. 571, 579. There is something in the nature of unity in their· possession of the gas in the reservoir.   2 Black. Com. 182.

It is charged in the complaint that the appellee is using in two wells owned by it, and threatens to use in others, pumping machinery and other devices by which the natural flow of the gas is greatly increased, and that the effect of the use of such machinery and devices is to remove the back pressure by which the gas is confined in the Trenton rock, and a vast body of salt water, lying underneath and surrounding the reservoir, is prevented from rushing into the reservoir and destroying it, and putting an entire stop to the flow of natural gas therein.   Certainly, such acts are destructive of the common interests in the gas and reservoir, and the threatened injury is a proper subject of ·relief· by injunction.

It does not appear from the complaint that there has been unreasonable delay on the part of the appellants in seeking relief, and it is clearly shown that they have a special interest in the gas in the ground, and a right to protect it from injury or destruction by the methods and appliances proposed to be used by the appellee in removing it from the common reservoir into its pipes.   The facts stated in the complaint constitute a cause of action, and the demurrer to it should have been overruled.   Judgment reversed, with instructions to overrule the demurrer, and for further proceedings in accordance with this opinion.