[L. A. No. 12311. In Bank.—December 3, 1930.]

PEOPLE OF THE STATE OF CALIFORNIA on Relation of FRED G. STEVENOT, etc., et al., Respondents, v. ASSOCIATED OIL COMPANY et al., Defendants; TWIN BELL OIL SYNDICATE et al., Appellants.

Neil S. McCarthy, Earl L. Banta, Harmel L. Pratt, Howard P. Hall and Charles A. Son for Petitioners and Appellants.

Call & Murphey, Robert B. Murphey, Asa V. Call, William L. Murphey, Arthur R. Smiley, Rush M. Blodgett, George W. Nilsson and Charles H. King, *Amici Curiae* for Petitioners and Appellants.

James S. Bennett and U. S. Webb, Attorney-General, for Respondents.

Roland Rich Woolley, *Amicus Curiae.*

SHENK, J.—This is a petition for a writ of *supersedeas* to stay the effect of a preliminary injunction pending an appeal therefrom by the petitioners herein.

The action was commenced in the county of Los Angeles on September 11, 1929, and in the name of the People on the Relation of Fred G. Stevenot, Director of Natural Resources of the State of California against some forty-three defendants who are oil producers owning oil-wells and leases in the Santa Fe oil-field in said county. The purpose of the action is to restrain the alleged unreasonable waste of natural gas from the wells of the defendants. In response to the order to show cause the defendants appeared and after an extended hearing the superior court granted a temporary injunction, the terms of which were complied with except by the defendants Twin Bell Syndicate, Second Twin Bell Syndicate and Star Petroleum Company, who have taken an appeal from the order granting the temporary injunction and who are the petitioners herein.

On the hearing it appeared from the allegations of the complaint and the affidavits and other evidence, both oral and documentary, in support thereof, that during the year 1928, 77,000,000,000 cubic feet of natural gas were wasted into the air from the subsurface oil and gas zones in the state of California through the operation of oil-wells; that because of the increase in the production of oil since that time a proportional increase in the wastage of natural gas is taking place, and that in the Santa Fe Springs oil-field alone there was at the time of the commencement of the action a wastage of natural gas to the extent of approximately 500,000,000 cubic feet of gas per day. This wastage was alleged to be unreasonable and unlawful under the terms of the so-called Oil and Gas Conservation Act. (Stats. 1915, p. 1404, as amended by Stats. 1929, p. 923.) In granting the preliminary injunction the court found that no sufficient cause had been shown why a preliminary injunction should not be issued as prayed for in the complaint; that the equities of all parties might be fairly con-

served by a preliminary injunction which would limit the waste of gas by restricting the production thereof to a quantity reasonably in excess of the present outlets for the beneficial use above ground; that the total gas escapage from outlets for all uses, with a reasonable tolerance to take care of fluctuating demands and the necessary waste, would be fixed at 285,000,000 cubic feet of gas per day in said field, and the estimated potential production of oil taken at 237,576 barrels per day distributed among lessees and other operating property units as shown by a schedule set out in the order. It was then provided in the order that the defendants be enjoined until the further order of the court: "1. From blowing, releasing, or permitting any natural gas to escape into the air from any well or wells in the Santa Fe Springs oil field before the removal of the gasoline from such natural gas. 2. From operating any well producing natural gas in the Santa Fe Springs oil field except while exercising a high degree of care in the selection and adjustment of appliances and in the use thereof for the purpose of keeping each producing well in its 'optimum gas-oil ratio'—the term 'optimum gas-oil ratio' being defined as the smallest number of cubic feet of gas which can be produced with each barrel of oil from the same well at the same time. 3. From producing more net formation gas on the average day of each seven (7) day period from any lease or other property unit than is set forth in the 'Allowed Gas Production' column following:" The name of each operator and of each well operated is then set out in detail and opposite thereto the estimated potential in barrels of oil per day and the allowed gas production in daily average as to each well is stated. The term "Gas-oil ratio", as used in the order, is declared to be "the proportion which the total number of cubic feet of formation gas bears to the total number of barrels of net oil produced from the same well at the same time, exclusive of the quantity of gas inserted in the well for the purpose of lifting the oil". The preliminary injunction contains other provisions not necessary to be noticed, except that the court retained jurisdiction to vacate or modify the same on five days' notice. The order was dated March 19, 1930, and to be effective two days later. On March 28, 1930, the court modified its order as to allowable gas production applicable to certain wells

and certain defendants operating the same, including the petitioners herein, and in such a way that instead of a gas allowance of 1200 cubic feet to a potential barrel of oil established by the original order, the petitioners were allowed approximately 2,000 cubic feet of gas to a potential barrel of oil. The oil cut in the field was fifty per cent of the potential, consequently the petitioners were allowed a potential ratio of 4,000 cubic feet of gas to a barrel of oil. From the order granting the temporary injunction the petitioners herein have taken an appeal.

The authority for the action in which the temporary injunction was issued is found in section 14b of the Oil and Gas Conservation Act (Stats. 1915, p. 1404, as amended, Stats. 1929, p. 923). The purpose of the act is stated in its amended title, which recites in part: "An act to protect the natural resources of petroleum and gas from waste and destruction." Section 8b of the amended act reads: "The unreasonable waste of natural gas by the act, omission, sufferance or insistence of the lessor, lessee or operator of any land containing oil or gas, or both, whether before or after the removal of gasoline from such natural gas, is hereby declared to be opposed to the public interest and is hereby prohibited and declared to be unlawful. The blowing, release or escape of natural gas into the air shall be *prima facie* evidence of unreasonable waste." Section 14b of the act provides in part: "Whenever it appears to the director of the department of natural resources that the owners, lessors, lessees or operators of any well or wells producing oil and gas or oil or gas are causing or permitting an unreasonable waste of gas, he may institute, or have proceedings instituted, in the name of the people of the state of California, to enjoin such unreasonable waste of gas. . . . Such proceedings shall be instituted in the Superior Court for the county in which the well or wells from which the unreasonable waste of gas is occurring or any thereof are situated. The owners, lessors, lessees or operators causing or permitting an unreasonable waste of gas in the same oil or gas field, although their properties and interests may be separately owned and their unreasonable waste separate and distinct, may be made parties to said action. In such suits no restraining order shall be issued *ex parte,* but otherwise the procedure shall be gov-

erned by the provisions of chapter three, title seven, part two of the Code of Civil Procedure of the state of California and no temporary or permanent injunction issued in such proceedings shall be refused or dissolved or stayed pending appeal upon the giving of any bond or undertaking, or otherwise.''

It is conceded that this court has the power, by virtue of section 4 of article VI of the Constitution and in aid of its appellate jurisdiction, to stay pending appeal the operation of a prohibitory injunction, and it is not seriously contended that the provision at the end of said section 14b that ''no temporary or permanent injunction issued in such proceedings shall be refused or dissolved or stayed pending appeal upon the giving of any bond or undertaking, or otherwise'', would have the effect of limiting the discretion of this court in the exercise of its constitutional power. ▆ Although the legislature may prescribe certain regulations in matters of appeal and restrict the granting of a stay of execution, it may not enact legislation which will deprive the reviewing court of its power under the Constitution to grant a writ of *supersedeas* in a proper case. (*United States of America* v. *Berg,* 202 Cal. 10, 13 [258 Pac. 942]; *Ohaver* v. *Fenech,* 206 Cal. 118 [273 Pac. 555].) Whether the application herein presents a proper case for the issuance of the writ is one of the principal points to be considered.

Three main contentions are advanced for the issuance of the writ: First, that the Conservation Act is unconstitutional because the enforcement of its provisions amounts to a taking of property without due process of law and if the taking be for a public purpose, that such taking is the taking of private property without compensation; secondly, that the provision of the act declaring unlawful the ''unreasonable waste'' of natural gas is so vague, uncertain and indefinite as to be devoid of any guide or standard as to what shall constitute reasonable or unreasonable waste of natural gas; and thirdly that the order is arbitrary and violative of the due process and equal rights guaranties of the state and federal Constitutions and that the showing made on this application presents a proper case for the issuance of the writ in order to preserve the appellants' rights pending appeal.

The foregoing contentions will be considered in the order stated. The first relates to the constitutionality of the act as an alleged police measure. This question is argued extensively by counsel for the parties and more at length by numerous *amici curiae* supporting the position of the petitioners, who contend that the pertinent portions of the act do not constitute a valid exercise of the police power of the state. It is argued that the state has no sufficient interest in oil and gas resources within its boundaries to justify its attempt to control what the owner of the land may do with his own beyond such relations as will prevent injury or are necessary to protect the life, health and safety of its citizens. But there is no longer any doubt that this general rule has been extended so as to include measures which relate to the general welfare. In the case of *Chicago, B. & Q. Ry.* v. *Illinois*, 200 U. S. 561 [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. Rep. 341], the Supreme Court stated at page 592: "We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." (Citing cases.) (See, also, *Bacon* v. *Walker*, 204 U. S. 311 [51 L. Ed. 499, 27 Sup. Ct. Rep. 289]; *Camfield* v. *United States*, 167 U. S. 519 [42 L. Ed. 260, 17 Sup. Ct. Rep. 864]; *Noble State Bank* v. *Haskell*, 219 U. S. 104 [Ann. Cas. 1912A, 487, 32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep. 186]; *Barbier* v. *Connally*, 113 U. S. 27 [28 L. Ed. 923, 5 Sup. Ct. Rep. 357]; *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 [54 L. R. A. 1016, 71 L. Ed. 303, 47 Sup. Ct. Rep. 114]; *Zahn* v. *Board of Public Works*, 274 U. S. 325 [71 L. Ed. 1074, 47 Sup Ct. Rep. 594]; *Block* v. *Hirsh*, 256 U. S. 135 [16 A. L. R. 165, 65 L. Ed. 865, 41 Sup. Ct. Rep. 458].) The same view has heretofore been expressed by this court in *Miller* v. *Board of Public Works*, 195 Cal. 477 [38 A. L. R. 1479, 234 Pac. 381]. The difficulty usually arises in determining whether the particular right sought to be regulated or prohibited is subject to such regulation or prohibition and whether in the particular case the legislature has gone too far with the resultant unlawful taking. It may not be disputed that the use of private property is a right as much entitled to protection

as the property itself, and an undue restriction on the use thereof is as much a taking "for constitutional purposes as appropriating or destroying it". (*Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 [28 A. L. R. 1321, 67 L. Ed. 322, 43 Sup. Ct. Rep. 158] ; *Missouri Pac. Ry.* v. *Nebraska,* 164 U. S. 403 [41 L. Ed. 489, 17 Sup. Ct. Rep. 130] ; *Pumpelly* v. *Green Bay Canal Co.,* 80 U. S. 166 [20 L. Ed. 557].)

If the question between the taking of private property and a proper exercise of the police power is fairly debatable, the statute will be upheld. (*Gorieb* v. *Fox,* 274 U. S. 603 [53 A. L. R. 1210, 71 L. Ed. 1228, 47 Sup. Ct. Rep. 675] ; *Zahn* v. *Board of Public Works, supra; Levy Leasing Co. Inc.* v. *Seigel,* 258 U. S. 242 [66 L. Ed. 595, 42 Sup. Ct. Rep. 289].)  Also where a strong and preponderant opinion prevails in the state that a particular measure is greatly and immediately necessary to the public welfare, that factor has an important influence in establishing the limitations of the police power in a particular case (*Muller* v. *Oregon,* 208 U. S. 412 [13 Ann. Cas. 957, 52 L. Ed. 551, 28 Sup. Ct. Rep. 324] ; *Noble State Bank* v. *Haskell, supra*) ; although such a view is always subject to the qualification stated by Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon, supra:* "The general rule at least is that while property may be regulated to a certain extent, if regulation *goes too far,* it will be recognized as a taking."

There are many cases and great uniformity of decision to the effect that the public has a sufficient interest in the preservation of oil and gas to justify legislation to prevent waste thereof, among which are *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576] ; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300 [65 L. Ed. 277, 41 Sup. Ct. Rep. 118] ; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 [Ann. Cas. 1912C, 160, 55 L. Ed. 369, 31 Sup. Ct. Rep. 337] ; *Hague* v. *Wheeler,* 157 Pa. St. 324 [37 Am. St. Rep. 736, 22 L. R. A. 141, 27 Atl. 714] ; *Quinton Relief Oil & Gas Co.* v. *Corporation Commr.,* 101 Okl. 164 [224 Pac. 156] ; *State* v. *Ohio Oil Co.,* 150 Ind. 21 [47 L. R. A. 627, 49 N. E. 809] ; *Commonwealth* v. *Trent,* 117 Ky. 34 [4 Ann. Cas. 209, 7 S. W. 390] ; *Louisiana Gas & Fuel Co.* v. *White Brothers,* 157 La. 728 [103 South. 23]. (See, also, note in 24 A. L. R., beginning at page 307.)

The argument is advanced by the petitioners and by their supporting *amici curiae* that the public interest cannot be

invoked where the common law as to the nature of the property right in the oil and gas prevails. The rule at common law is that the owner of the land owns everything above and beneath the surface and it is contended that oil and gas beneath the surface are recognized as part of the realty and belong to the owner of the land and are a part of it so long as they are on it or in it or subject to his control. In this they are supported by the case of *Gas Products Co.* v. *Rankin,* 63 Mont. 372 [24 A. L. R. 294, 207 Pac. 993], where the same rule was applied to gas and oil beneath the surface as to minerals in place, such as coal and ore. But Montana appears to be the one state, among the many gas and oil producing states, which has established such a rule of property with reference to gas and oil. By uniformity of decision elsewhere the common-law rule has been modified in order to adapt it to the peculiar nature of gas and oil. The rule universally adopted, except in Montana, is expressed in *Brown* v. *Spillman,* 155 U. S. 665 [39 L. Ed. 304, 15 Sup. Ct. Rep. 245], as follows: "Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property." (Citing cases.) In this state the character of oil beneath the surface as distinguished from that of the precious metals, fixed in the veins which hold them, was well described in *Acme Oil & Min. Co.* v. *Williams,* 140 Cal. 681 [74 Pac. 296], wherein it was said at page 684: "Oil, on the contrary, is of a fluctuating, uncertain, fugitive nature, lies at unknown depths, and the quantity, extent, and trend of its flow are uncertain. It requires but a small surface area, in what is known as an oil district, upon which to commence operations for its discovery. But when a well is developed the oil may be tributary to it for a long distance through the strata which holds it. This flow is not inexhaustible, no

certain control over it can be exercised, and its actual possession can only be obtained, as against others in the same field, engaged in the same enterprise, by diligent and continuous pumping. It is the property of anybody who can acquire the surface right to bore for it, and when the flow is penetrated, he who operates his well most diligently obtains the greatest benefit, and this advantage is increased in proportion as his neighbor similarly situated neglects his opportunity.'' The same rule would apply to natural gas. It is common knowledge that the surface right to prospect for and recover oil and gas, apart from the land in which they are situated, is the subject of barter, lease or sale. When so acquired the right is subject to assessment apart from the land. (*Graciosa Oil Co.* v. *Santa Barbara,* 155 Cal. 140 [20 L. R. A. (N. S.) 211, 99 Pac. 483].)
The generally accepted view, therefore, is that the property right of the owner or lessee of land in and to the gas and oil beneath the surface is not an absolute one. Such substances, because of their peculiarity in the natural state, partake more of the nature of common property, title to which becomes absolute when they are captured and reduced to possession. Because of their peculiar nature the public has a definite interest in their preservation from waste and destruction. This is true because of their character as natural resources and also because the public interest has attached by virtue of positive statutory law or by court judgment independent of statute. In seven states of the Union legislation making unlawful the unreasonable waste of natural gas has been upheld: Indiana: *Indiana* v. *Ohio Oil & Gas Co.,* 150 Ind. 21 [47 L. R. A. 627, 49 N. E. 809]; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576]. Kentucky: *Commonwealth* v. *Trent,* 117 Ky. 34 [4 Ann. Cas. 209, 77 S. W. 390]. Wyoming: *Walls* v. *Midland Carbon Co.,* 254 U. S. 300 [65 L. Ed. 276, 41 Sup. Ct. Rep. 118]. Oklahoma: *Quinton Relief O. & G. Co.* v. *Corporation Com.,* 101 Okl. 164 [224 Pac. 156]. Louisiana: *State* v. *Carson Carbon Co.,* 162 La. 781 [111 South. 162]. Texas: *Oxford Oil Co.* v. *Atlantic Oil P. Co.,* 22 Fed. (2d) 597, (*certiorari* denied United States Supreme Court, 277 U. S. 585 [72 L. Ed. 1000, 48 Sup. Ct. Rep. 433); *Railroad Com. of Texas* v. *Bass,* (Tex. Civ. App.) 10 S. W. (2d) 586; *Magnolia Petroleum Co.* v.

*Stroud,* (Tex. Civ. App.) 3 S. W. (2d) 462. Kansas: *State* v. *Lebow,* 128 Kan. 715 [280 Pac. 773, 775] ; *Marrs* v. *City of Oxford,* 32 Fed. (2d) 134 [67 A. L. R. 1336]. Rehearing denied, Circuit Court of Appeals, May 17, 1929. *Certiorari* denied, United States Supreme Court, October 21, 1929. Independently of statute the waste of gas resulting merely in a depletion of the supply in a common reservoir has been enjoined. (*Manufacturers Gas & Oil Co.* v. *Indiana Natural Gas Co.,* 155 Ind. 461 [50 L. R. A. 768, 57 N. E. 912], and 156 Ind. 679 [59 N. E. 169, 60 N. E. 1080] , *Louisville Gas Co.* v. *Kentucky Heating Co.,* 117 Ky. 71 [111 Am. St. Rep. 225, 4 Ann. Cas. 355, 70 L. R. A. 558, 77 S. W. 368], and 132 Ky. 435 [11 S. W. 374] ; *Louisiana Gas & Fuel Co.* v. *White Brothers,* 157 La. 728 [103 South. 23].) The leading case on the power of the state to prevent the waste of natural gas is *Ohio Oil Company* v. *Indiana,* 177 U. S. 190 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576]. There a statute of Indiana was sustained which made it unlawful to permit the escape of natural gas from any well for more than two days after oil or gas had been struck, without storing the same. There is considerable discussion in that case concerning the protection necessary to be accorded the correlative rights of adjoining land owners in the same field, and the petitioners herein seek to confine the holding of the Supreme Court in that case to the protection, under the exercise of the police power, of those correlative rights. But the holding in that case cannot be so limited. The decision in that case defines the so-called correlative right not necessarily as a right to a fixed distributive or proportional share of the oil and gas underlying the surface, which no other owner of soil overlying the same reservoir may take and use beneficially, but as a coequal right to take whatever of the oil and gas can be captured, so long as waste, as defined by the statute, is not committed.

In the Ohio Oil Company case the Supreme Court, at page 204, quoted with approval from *Hague* v. *Wheeler,* 157 Pa. 324 [37 Am. St. Rep. 736, 22 L. R. A. 141, 27 Atl. 714], as follows: " 'Now it is doubtless true that the public has a sufficient interest in the preservation of oil and gas from waste to justify legislation on the subject. Something has been done in this direction already by the acts regulating the plugging of abandoned wells. . . . In the disposition he may make of it (private property) he is sub-

ject to two limitations. He must not disregard his obligations to the public. He must not disregard his neighbor's rights. If he uses his product in such a manner as to violate any rule of public policy, or any positive provisions of the written law, he brings himself within the reach of the courts. If the use he makes of his own, or its waste, is injurious to the property or the health of others, such use or waste may be restrained, or damages recovered therefor; but, subject to these limitations, his power as an owner is absolute until the legislature shall, in the interest of the public, as consumers, restrict and regulate it by statute.' "

Again the Supreme Court, in the same case, at page 207, referring to *Townsend* v. *State*, 147 Ind. 624 [62 Am. St. Rep. 477, 37 L. R. A. 294, 47 N. E. 19], said: "In a full opinion reviewing the nature of the ownership in oil and natural gas, the power of the state to regulate and control their use and waste in the interest of all those within the gas field and of the public at large was elaborately considered. Reviewing its own previous adjudications, which we have cited, and those of the supreme court of the state of Pennsylvania, to which we have also referred, it was decided that the owners of the surface of the land within the gas field, whilst they had the exclusive right on their land to sink wells for the purpose of extracting the oil and gas, had no right of property therein until by the actual drawing of the oil and gas to the surface of the earth they had reduced these substances to physical possession. It was further held that in consequence of the nature of the deposits, of their transmissibility, of their interdependence, of the rights of all and of the public at large, the state could lawfully exercise the power to regulate the right of the surface owners among themselves to seek to obtain possession, and to prevent the waste of the products in which all the surface owners within the area wherein the gas and oil were deposited, as well as the public, had an interest, because in the preservation of these substances the well-being and prosperity of the entire community was largely involved. And it was upon the opinion announced in that case that the court rested its decree in the case now under review."

Section 21a of our statute provides, among other things, for the levy of charges necessary to supervise and protect

deposits of oil and gas within the state, "in which deposits the people of the state of California are hereby declared to have a primary and supreme interest". (Stats. 1917, p. 1598.) This declaration is in accord with the prevailing opinion, both legislative and judicial, in the many jurisdictions where the exploitation and waste of such natural resources as gas and oil have attracted and received intelligent public consideration.

Whatever refinements may be suggested as to the definition of the nature of the property right in gas and oil beneath the surface and uncaptured, we are entirely satisfied that the waste of these natural resources may be regulated and the unreasonable waste thereof may be prohibited in the exercise of the police power of the state, and that the statute in question is not subject to the objections first advanced by the petitioners.

It is next contended that the term "unreasonable waste" has not been defined by the statute; that it is so uncertain in its meaning and so devoid of a rule or standard of conduct that an ordinary person cannot determine in advance what he may and may not do, and that it is therefore void within the doctrine of such cases as *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 221 [58 L. Ed. 1284, 34 Sup. Ct. Rep. 853]; *United States* v. *L. Cohen Grocery Co.*, 225 U. S. 81 [14 A. L. R. 1045, 65 L. Ed. 516, 41 Sup. Ct. Rep. 298]; *Conally* v. *General Const. Co.*, 269 U. S. 385, 391 [70 L. Ed. 322, 46 Sup. Ct. Rep. 126]; *United States* v. *Frink Dairy Co.*, 274 U. S. 445 [71 L. Ed. 1146, 47 Sup. Ct. Rep. 681; *Hewitt* v. *Board of Medical Examiners*, 148 Cal. 590 [113 Am. St. Rep. 315, 3 L. R. A. (N. S.) 896, 84 Pac. 39].)

Courts are entitled to take judicial notice of the condition and development of the petroleum industry. (*Gilbreath* v. *States Oil Corp.*, 4 Fed. (2d) 232.) The present status of the importance of petroleum and gas in industry is stated in the recent case of *Boone* v. *Kingsbury*, 206 Cal. 148, 181 [273 Pac. 797]. Courts may also take judicial notice of all matters of science and common knowledge. (*Reynolds* v. *McMan Oil & Gas Co.*, (Tex. Com. App.) 11 S. W. (2d) 778, 784.) Facts relating to the general nature of so-called oil "sands" which also contain natural gas, such as are found in this state, and the physical

and economic laws governing oil and gas production, the present general economic status and the necessity and pressing demand for conservation to prevent waste in the gas and oil producing industry, may be found in the following scientific reports referred to by counsel, viz.: Report 111 of the Federal Oil Conservation Board to the President of the United States, Feb. 25, 1929; Bulletin 194, Department of the Interior, Petroleum Technology 61, published as a report of the Bureau of Mines in 1921 by Carl H. Beal and J. O. Lewis; Bulletin 232, Department of the Interior, Manual for Oil and Gas Operations, prepared by T. E. Swigart and C. E. Beecher, 1923; Technical Paper 322, Department of the Interior, Experiments in the Use of Back Pressures on Oil Wells, T. E Swigart and C. R. Bopp, 1924; Department of Commerce, Mineral Resources of the United States, 1927, Part II, pages 129–137, Natural Gas, by G. R. Hopkins and H. Backus; Department of Commerce, United States Bureau of Mines, 1929, H. C. Miller, Function of Natural Gas in the Production of Oil; Reports of American Bar Association, 1927, vol. 52, page 577 et seq.

For present purposes it need only be noted that oil in this state is found under layers of rock in a sand or sandstone formation termed a lentille or "lentil", under pressure caused by the presence of natural gas within the formation. The layers of rock thus form a gas-tight dome or cover for the oil reserve. The oil adheres in the interstices between the sand particles. The natural gas may be in a free state at the top of the dome, but is also in solution with the oil, thus increasing the fluidity of the oil and the ease with which the oil is lifted with the gas in solution when the pressure on the gas is released by drilling into the oil "sand". It is estimated that only from ten to twenty-five per cent of the total amount of oil deposited in a reservoir is ultimately recovered, depending on the natural characteristics of the reservoir and the methods employed in utilizing the lifting power of the gas. The importance of gas in the oil-producing industry has, therefore, become a question of great concern to the industry itself and to government, to the end that its function may be fully utilized without waste. It fairly appears on this application that, depending on its location in the oil reservoir, the extent of the oil "sand", the degree of pressure within the formation, the amount of oil in the "sand", the

amount of gas in solution with the oil, the porosity of the "sand" and other considerations, each oil and gas well has a best mean gas and oil ratio in the utilization of the lifting power of the gas and the production of the greatest quantity of oil in proportion to the amount of gas so utilized, and which may be computed as to each individual well to a reasonable degree of certainty and be regulated accordingly. Gas, therefore, which has been allowed to come to the surface without its lifting power having been utilized to produce the greatest quantity of oil in proportion, may be said to amount to an unreasonable waste of natural gas.

That the legislature intended to prohibit such a waste of natural gas, and so defined the term "unreasonable waste", is quite apparent from a consideration of the provisions of a portion of section 8d of the act. Section 8d relates to the procedure upon complaint of undue waste filed with the director of natural resources, and the portion thereof immediately quoted is offered to us by petitioners as the only statement in the act of any standard of "unreasonable waste", viz.: "If it shall appear that gas is being produced from any oil well or wells in quantities exceeding a reasonable proportion to the amount of oil produced from the same well or wells, even though it is shown that such excess gas is being used in the generation of light, heat, power or other industrial purpose, and that there is sufficient other gas available for such uses from other wells in the same or other fields in which the gas produced is not in excess of the amount which bears a reasonable proportion to the amount of oil produced from such other wells, and that there are adequate gas-pipe line connections between such other wells and the place of utilization of such gas, the state oil and gas supervisor shall hold that such excess production of gas is unreasonable waste thereof if such holding will not cause an unreasonable waste of gas in any other field." It would seem, therefore, that the legislature has plainly adopted the standard so expressed, viz.: that gas may not be produced, under existing conditions where the production thereof so greatly exceeds the market demand therefor, in quantities exceeding a reasonable proportion to the amount of oil produced, as the standard to be applied and beyond which the production is prohibited as being an unreasonable waste of natural gas.

The standard so adopted by the legislature is, we think, not objectionable as being too vague or uncertain of application. The best mean ratio, or the amount of gas which bears a reasonable proportion to the amount of oil produced, may vary for each reservoir or deposit of oil, depending on the natural characteristics above mentioned, and may, and probably does, vary for each well drilled into the same reservoir, depending on the location of the well and other factors. Therefore, because of the many and varying conditions peculiar to each reservoir and to each well, which will bear upon a determination of what is a reasonable proportion of gas to the amount of oil produced, it may be said that it would be impossible for the legislature to frame a measure based on ratios or percentages or definite proportions which would operate without discrimination, and that what is a reasonable proportion of gas to the amount of oil produced from each well or reservoir is a matter which may be ascertained to a fair degree of certainty in each individual case. The adoption, therefore, of such a measure seems to us to be within the scope of cases upholding other legislative enactments which have employed the so-called "rule of reason". Citation of authority is not necessary to support the statement that the standard of reason has been applied in many cases where certainty is less capable of measurement than in the present case, for instance, in statutes prohibiting unreasonable restraints of trade, the common-law rule of a reasonable use of water by riparian owners, the rule of law regulating the duty of care, etc. Instances "where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree", are common. (See *Nash* v. *United States*, 229 U. S. 373, 377 [57 L. Ed. 232, 33 Sup. Ct. Rep. 780].)

The so-called "price" and similar cases relied upon by the petitioners as establishing the contrary doctrine, and above cited, involve the uncertainty of man's judgment as to what is an unjust, or unreasonable price, or a current rate, or fair market value, in fluctuating or uncertain markets, so as to make the risk of conduct so great as to be without the pale of certainty required for the terms of a statute. The case of *Hewitt* v. *Board of Medical Exam-*

*iners, supra,* is also clearly distinguishable, in that the prohibition against gross and improbable statements in medical advertising involved therein does not define any measure upon which two persons may agree within any degree of certainty. The argument is made that the same conclusion must be reached in respect to the standard of reasonableness required by the present statute, for the reason that the standards applying the "rule of reason" in cases said to be analogous have been gleaned from or formulated by previous legislation or by many prior decisions or are within the common experience of mankind. But this argument is not persuasive when it may be said that scientific knowledge and oil and gas operating experience have achieved a similar degree of certainty in the field in which the present standard will apply. Whether the evidence sustains the ratio applied by the court in this case under such standard is a question on the merits of the appeal and is not pertinent to a determination of the merits of this application.

Objection is made to the provision of section 8b of the act that "the blowing, release or escape of natural gas into the air shall be *prima facie* evidence of unreasonable waste", as inconsistent with other provisions of the act which it is claimed authorize some waste of gas in the production of oil. The state has the power generally "to prescribe the evidence which shall be received and the effect which shall be given to it in her courts, and may exert this power by providing that proof of a particular fact, or of several taken collectively, shall be *prima facie* evidence of another fact". (*Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 [Ann. Cas. 1912C, 160, 55 L. Ed. 369, 31 Sup. Ct. Rep. 37].) In prescribing that any waste shall be *prima facie* evidence of unreasonable waste, the state has cast upon the party found to be wasting gas the burden of justifying the same. A statute which casts the burden of proof upon the defendant in a criminal action upon the proof of certain facts for whose existence he is responsible, has been upheld. (*People* v. *Osaki,* 209 Cal. 169 [286 Pac. 1025].) As applied to a civil action a statute imposing the burden of proof is freed from the objections incident to the rules inherent in a criminal prosecution and cannot be

avoided for any reason suggested by the petitioner or otherwise apparent.

It is contended that the real purpose of the statute is to curtail the production of oil so as to regulate and stabilize the market price thereof. We cannot agree with this contention. Obviously the enactment is an effort on the part of the legislature to conserve for present and future needs great natural resources in which the people of the state are interested. It may be that the enforcement of the statute throughout the gas and oil producing sections of the state may have an effect upon the market price of oil. For this reason the subject matter of the act is a delicate one for legislative treatment and judicial cognizance. But the fact that the field of economic law to some extent may thus be invaded may not justify the avoidance of the statute. As we view the terms of the act the primary function of gas in the production of oil is recognized, and its complete utilization in that respect, without unnecessary waste, is attempted to be safeguarded. The additional function of the gas in providing light and heat for manufacturing and domestic purposes is also recognized, and the effort is made to compel the fullest utilization as to both functions. The act, without doubt, was a response to a growing recognition that the continuing and increasing waste of the propulsive energy of gas underground and of its full energy above ground was unreasonable and should be inquired into and regulated, to the end that the public convenience and general prosperity of the commonwealth be promoted. Such legislation should not be stricken down because there may be an incidental and unavoidable interference in the economic field. The result complained of— the lessening of the daily production of oil—if it follow from the operation of the statute, is a matter of concern for the legislature and cannot of itself make void a police measure which is otherwise a constitutional exercise of a legislative power. "At least", as was stated in *Noble State Bank* v. *Haskell*, 219 U. S., at page 111 [Ann. Cas. 1912A, 487, 32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep. 186], "if we have a case within the reasonable exercise of the police power, as above explained, no more need be said".

Some argument also is advanced that the statute is unconstitutional because it embraces more than one subject and that the title does not express the subjects embraced in

the act; that the statute impairs the obligations of contracts and that it deprives petitioners of the equal protection of the laws and grants special privileges and immunities. We have considered these arguments and, except such as are related to the matters herein elsewhere discussed, we deem it unnecessary to give them any further notice.

The final question to be considered is whether the particular preliminary injunction ordered by the trial court violates any constitutional guaranties. The terms of the order in establishing the gas-oil ratio have been hereinbefore specifically noted. It is contended that the enforcement of the terms of the order will require the shutting down of well No. 4 of the petitioner, Star Petroleum Company. Conceding this to be so, it is the contention of the respondents that the operator is in no position equitably to insist that that well, which is called a "waster", may operate to the manifest detriment of the other operators in the field and to the public in general. There are twelve oil and gas zones in the Santa Fe Springs oil-field, varying in depth from 3,450 to 8,000 feet. The area of land within the oil-field is divided into not less than 1145 parcels at the surface. These parcels are owned of record by more than 110 individuals and corporations. Many of the parcels are rectangles less than 75 feet by 100 feet. The Star Well No. 4 is on one of the smaller parcels, being located within a radius of 137 feet from the exterior boundaries of the parcel on which it is located. This well has withdrawn the equivalent of all the recoverable oil within said exterior boundaries and has withdrawn gas and large quantities of oil from the lands of its neighbors. Under the rule in this state such withdrawal is recognized as lawful and without trespass. Without more, however, the foregoing facts with reference to this well may be said to be insufficient upon which to base an injunctive order. But when it further appears that in the operation of this well the natural gas-oil ratio is injurious to the rights of all of the adjoining land owners and to the public in general by reason of the unreasonable waste of gas in the operation thereof, we have no hesitancy in saying that it should be shut down until more efficient methods are employed to conserve the wasted product. The statute held valid in the case of *Ohio Oil Co.* v. *Indiana, supra,* permitted no waste of gas whatsoever

for a longer period than two days after gas or oil had been struck. The margin between no waste at all and a reasonable waste in recognition of the propulsive function of the gas is largely one of fact. In the ascertainment of the fact the legislature has vested in the superior court full power and duty in the premises. It is contended by the petitioner that the statute, as applied by the court, has made it practically impossible to profitably extract the oil. The same contention was advanced with seemingly more justification, but was rejected, in the case of *Ohio Oil Company* v. *Indiana, supra.*

As we understand the order the natural gas outlets in the entire field were taken as 285,000,000 cubic feet of gas per day, determined by the beneficial uses to which such gas could be put, and which contained a certain tolerance for necessary and unavoidable waste and the fluctuations in the demands for the same. The court then, for safety, increased the amount by some 10,000,000 cubic feet and fixed the daily "Allowed Gas Production" for the entire field at such increased amount. It then prorated this "Allowed Gas Production" among the separate operating properties of the defendants and in connection therewith estimated the "Potential Oil Production" of the field at 237,576 barrels of oil per day. In other words, the court limited the total quantity of gas which might be produced from the field and allotted proportional amounts thereof to the separate parcels of land of the defendants based on the estimated potential oil production of each parcel. As to the facts, there is no serious dispute. The experts whose testimony was received by the trial court were not in accord as to the proper methods to apply in enforcing co-operation in response to the statute. Reading the act as a whole, it cannot be said that the method of its enforcement adopted by the court was unlawful or improper. We find no reason at this time to interfere with the action taken. The court reserved to itself the right to modify the preliminary injunction as occasion may require, and this, we assume, the court will do if and when, by test and experience, other proper methods may be discovered and applied to the correction of the evil of unreasonable waste of this natural resource. Other points need not be discussed.

The writ of *supersedeas* is denied and the order to show cause is discharged.

Richards, J., Curtis, J., Preston, J., Langdon, J., Seawell, J., and Waste, C. J., concurred.

Rehearing denied.