## PATTERSON v. STANOLIND OIL & GAS CO. et al.

No. 27884.    March 1, 1938.

A. S. Norvell, W. M. Haulsee, and R. J. Roberts, for plaintiff in error.

Clay Tallman, Guy H. Woodward, Victor C. Mieher, Joseph A. Gill, Jr., and Ray S. Fellows, for defendants in error.

W. A. Delaney, Jr., W. T. Anglin, R. L. Gordon, Jas. A. Veasey, R. B. F. Hummer, and Robert S. Kerr, amici curiae.

DAVISON, J. This action questions the constitutionality of chapter 59, art. 1, Session Laws 1935, an oil and gas conservation measure commonly known as the "Well-Spacing Act," whereby in certain proceedings had before the Corporation Commission said commission is authorized to promulgate rules and regulations as to the spacing of oil and gas wells in the different pools of Oklahoma. The present action was commenced in the district court of Tulsa county by the plaintiff in error, a royalty owner, against the defendants in error, colessees, to recover the sum of $988.68, allegedly due him as his share of the proceeds from oil produced by said lessees by reason of his ownership of an undivided one-sixteenth interest in the minerals under the tract of land upon which the production was procured.

The parties will hereinafter be referred to as they appeared in the trial court.

The defendants denied that the plaintiff was entitled to the sum he prayed for, but alleged that his share of the proceeds of said well amounted to the sum of only $824.32, which they tendered into court. The reasons they assigned for the plaintiff being entitled to this sum rather than the larger one which he sought were that the well from which the production was derived was located in the center of a ten-acre drilling unit, the creation of which was authorized by order of the Corporation Commission issued on June 18, 1936, in accordance with the provisions of chapter 59, S. L. 1935, and that after the issuance of said order the owners of the royalty interests in said drilling unit, other than the plaintiff, were entitled, by the provisions of subdivision (c) of section 3, art. 1, of said well-spacing act, to the difference between the sum they tendered into court and the sum that the plaintiff prayed for.

At the trial no evidence was introduced except the lease of the defendants, the mineral deed of the plaintiff and the various documents filed in the proceedings had before the Corporation Commission in which the above-mentioned well-spacing order was issued. The parties stipulated the physical facts concerning the drilling, location, and production of the well in question.

The trial court rendered judgment for the plaintiff in only the amount which the defendants had tendered, and the plaintiff has appealed.

The land upon which the aforementioned order of the Corporation Commission established ten-acre well-spacing is known as "The North Wellston Area" in Lincoln county, and includes 520 acres as shown on the plat below. The only specific portions of this area necessary to mention herein make up an 80-acre tract described as the N.½ of the S.E.¼ of section 35, township 15 N., range 2 east, designated by the shaded strips on the plat. Of this tract, the north 25 acres and the south 55 acres are under separate ownership and are covered by separate oil and gas leases jointly owned by the defendants. On the plat below, the 25-acre tract is represented by the portion in darker shading marked tract "A", while the

55-acre tract is represented by the portion in lighter shading and is designated as tract "B". The plaintiff's mineral deed covers tract "A", only. The site upon which the defendants drilled the well in question is in the center of a ten-acre unit in the northeast corner of the 80-acre tract. This unit consists of 6¼ acres in tract "A" and 3-3/4 acres in tract "B" and is represented by the small heavily outlined square on the plat. As shown by the large dot representing the location of the well, the same is entirely upon tract "A", in which the plaintiff's interest lies. The well was completed some months prior to the date of the aforesaid spacing order of the commission.

The allegations contained in the plaintiff's reply to the defendant's answer, which pleaded the proceedings of the Corporation Commission out of which the well-spacing order for the North Wellston Area was issued as the basis for their contention that the plaintiff was entitled only to the sum that they tendered instead of the sum he prayed for, are substantially as follows: That said proceedings of the commission and the statute authorizing same are violative of the following constitutional provisions, to wit: Section 7, article 2, of the Oklahoma Constitution, which prohibits the taking of life, liberty, or property without due process of law, and section 1 of the Fourteenth Amendment to the United States Constitution, which contains the same prohibition and provides for equal protection of law to all citizens; section 23, article 2, of the Oklahoma Constitution, which prohibits the taking of property for private use; section 59, article 5. of the Oklahoma Constitution, which provides for the uniform operation of laws; section 15, article 2, of the Oklahoma Constitution, and section 10, article 1, of the United States Constitution, which prohibits the impairment of contract obligations; and section 1, article 4, of the Oklahoma Constitution, which provides for a distribution of the powers of government.

In this appeal the plaintiff presents essentially the same contentions that he advanced in the trial court in support of the allegations above named, except that he specifies additional error in the retroactive effect which the judgment of the trial court gave the Corporation Commission's well-spacing order in question. This error has been confessed before this court, and in this connection the defendants have tendered the additional sum of $47.68, which represents the proportion claimed by the plaintiff of the proceeds of the oil produced by the well in question from the time that it was completed as a producer to the date of the commission's spacing order. Another departure from the issues joined in the trial

court is the waiver by plaintiff's counsel, upon oral argument, of one of the contentions previously urged to support the allegation that the plaintiff has been denied due process, to wit: that he was not legally summoned to the proceedings in which the well-spacing order was made and entered.

The questions raised herein can be consolidated into two principal ones and stated as follows: (1) Does the state have the power to enact legislation providing for well-spacing? (2) If it does possess such power, is the same constitutionally exercised by the enactment of chapter 131, Session Laws 1933, and its amendment, which is chapter 59, art. 1, Session Laws 1935, and by the proceedings therein prescribed?

As to the first question, the plaintiff contends that the well-spacing order in question has the effect of depriving him of property without due process of law in that it authorizes the distribution of the production of the well in question (as well as all others in the North Wellston Area), in accordance with the provisions of subdivision (c) of section 3, art. 1, c. 59, S. L. 1935, which reads as follows:

"In the event a producing well, or wells, is completed upon a unit where there are two or more separately owned tracts, any royalty owner, or group of royalty owners, holding the royalty interest under a separately owned tract, shall share in one-eighth of all of the production from the well or wells drilled within the unit in the proportion that the acreage of their separately owned tract bears to the entire acreage of the unit."

In the present case, the defendants' compliance with the above provision allows the owners of the mineral rights in the 3-3/4 acres of the drilling unit to share with the plaintiff and his co-owners of the mineral rights in the other 6¼ acres of the unit, the oil and gas produced from the well on said unit, though said well is located entirely upon the surface of the 6¼ acre tract. The plaintiff contends that according to the fundamental rule of oil and gas ownership, the owner of land is entitled to all of such minerals that he is able to reduce to possession thereon and that he (plaintiff) according to said rule is entitled to the portion of all of the oil and gas produced on said 6¼ acres that is provided for in his mineral deed and the defendants' lease. His contention is that when such portion is reduced by the distribution of this production among the owners of the adjoining 3-3/4 acres, he is deprived of property without due process of law, and that the same is taken for private use without just compensation, and that the contractual obligations of both the deed and the lease are thereby abrogated.

The plaintiff's counsel impliedly admit, as they must, that if the power to enact laws for the spacing of oil and gas wells comes within the police power of the state, then this power, when reasonably exercised, supersedes individual property and contract rights, but they contend that the police power does not extend to the power assumed by the Legislature in the enactment of the statutes in question.

The contention of the defendants is that the theory of ownership in oil and gas relied upon by the plaintiff is not applicable to oil and gas derived from a source of supply common to adjoining tracts of land and that the production of the well in question is derived from such a common source of supply. This claim as to the character of the source of supply is supported by the finding to that effect that is incorporated in the order of the Corporation Commission herein attacked, and there is no evidence in the record to dispute this finding. Therefore, we must assume that the source of supply of the well in question is common to the land adjoining it and that said pool underlies not only the 6¼ acres of land on which the well is located, but that it also extends beneath the 3-3/4-acre tract. Thus we have but to see whether the claims of the owners of the land on which the oil and gas is produced to all of said production shall be defeated by the rights of adjoining owners in said pool. The decision of the United States Supreme Court in the case of Ohio Oil Co. v. State of Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729, was based upon the theory that the right of the owner of land to the oil and gas thereunder is not exclusive but is common to and merely coequal with the rights of other landowners to take from the common source of supply, and therefore that his property rights to said oil and gas are subject to the legislative power to prevent the destruction of the common source of supply. It has already been decided that this police power of the state to prevent the destruction of the common source of supply may be exercised by regulation of the production therefrom. In Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, the principles asserted in the Indiana case, supra, were recognized, and the court said:

"Every person has the right to drill wells on his own land and take from the pools below all the gas and oil that he may be able to reduce to possession including that coming from land belonging to others, but the right to take and thus acquire owner-

ship is subject to the reasonable exertion of the power of the state to prevent unnecessary loss, destruction or waste. And that power extends to the taker's unreasonable and wasteful use of natural gas pressure available for lifting the oil to the surface and the unreasonable and wasteful depletion of a common supply of gas and oil to the injury of others entitled to resort to and take from the same pool." (Citing many authorities.)

The cases which uphold the power of the state to prevent the depletion of a common source of supply of gas and oil by the regulation of production are numerous. The exercise of such power has also been upheld under the provisions of our own state Constitution. C. C. Julian Oil & Royalties Co. v. Capshaw, 145 Okla. 237, 292 P. 841; Wilcox Oil & Gas Co. v. State, 162 Okla. 89, 19 P.2d 347, 86 A. L. R. 421; and Sterling Refining Co. v. Walker, 165 Okla. 45, 25 P.2d 312. It has also been held that such regulation could be lawfully executed by limitations upon the drilling of wells and well-spacing. Marrs v. City of Oxford, 8 Cir. 32 F.2d 134, cert. den. 280 U. S. 573, 50 S. Ct. 29, 74 L. Ed. 625; Oxford Oil Co. v. Atlantic Oil Producing Co., 5 Cir. 22 F.2d 597, cert. den. 277 U. S. 585, 48 S. Ct. 433, 72 L. Ed. 1000; Brown v. Humble Oil & Refining Co. (Tex.) 83 S. W.2d 935; Helmerich & Payne v. Roxana Petroleum Corp. (Kan.) 14 P.2d 663. In Blevins v. Harris, 172 Okla. 90, 44 P.2d 112, this court held that the one-eighth royalty provision of an oil and gas lease was not violated by an order of the board of adjustment authorized by an Oklahoma City ordinance which provided that the owners of various tracts which had been joined together to constitute a drilling block should participate in the one-eighth royalty of all the oil produced from a well to be drilled on said block. In that case we quoted with approval certain portions of the opinion in Marrs v. City of Oxford, supra. In the Marrs Case, the Circuit Court of Appeals upheld as denying none of the rights, privileges, and immunities guaranteed by the federal Constitution, a Kansas City ordinance which provided for a distribution among the owners of portions of a city block, shares of the proceeds from a well drilled in the block in the proportion that the size of their parcels bore to the entire area of said block. In both the Blevins Case and the Marrs case, effect was given to the principle of the correlative rights of adjoining owners announced in the following language of the United States Supreme Court in Ohio Oil Co. v. Indiana, supra:

"But there is a coequal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of others, or by waste by one or more to the annihilation of the rights of the remainder. Hence, it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all of the collective owners, by securing a **just distribution** to arise from the enjoyment by them, of their privilege to reduce to possession, and to reach the like end by preventing waste."

From the foregoing authorities, it is obvious that it is not beyond the police power of the state to restrict the individual owner's taking from the common source of supply, as well as to authorize a "just distribution" among the various owners of mineral rights in land overlying the common source of supply, of that portion of said supply so taken or reduced to possession by the individual owner. The restriction of drilling by the spacing of wells seems to be a much more feasible and effective method of securing a just distribution for such owners than restrictions upon production after same has already commenced, for it tends to eliminate many distinct faults apparent in such regulations. One of these was pointed out by Judge Kennamer when the case of Champlin Refining Co. v. Corporation Commission, supra, was before the federal district court (51 Fed.2d 823). He said the following of the 1915 conservation law:

"Acreage is ignored and an operator with two 5,000 barrel-wells on five acres may take out of the common source of supply, under the provisions of section 4, as much oil as an operator with two 5,000 barrel wells on 20 acres in the same field. Proportionate taking per well is wholly inequitable if the Legislature intends to secure 'a just distribution' to arise from the enjoyment. * * * of their privilege to reduce to possession,' because the operator with 20 acres has four times as much privilege as the operator with five acres in the same field."

The "wasteful necessity of drilling offset wells" is another vice which is minimized by such restrictions on drilling. Helmerich & Payne v. Roxana Petroleum Corp. (Kan.) 14 P.2d 663. One of the essentials to the preservation of the common source of supply or the prevention of its waste is the preservation of the reservoir energy necessary to production therefrom by the natural process

of flowing. This has been recognized by the courts, and the power of the state to prevent the waste of said reservoir energy is beyond successful contradiction. People v. Associated Oil Co., 211 Cal. 93, 294 P. 717; Bandini Petroleum Co. v. Superior Court of Los Angeles County, Cal., 284 U. S. 8, 76 L. Ed. 136, 52 S. Ct. 103; Champlin Refining Co. v. Corporation Commission, supra, and others. The restriction of drilling limits the number of penetrations in the reservoir and it seems logical that the less the reservoir is punctured, the less the supply of reservoir energy is likely to be depleted.

Thus, in our opinion, it is well established that the police power of the state extends to protecting the correlative rights of owners in a common source of oil and gas supply and this power may be lawfully exercised by regulating the drilling of wells into said common source of supply and distributing the production thereof among the owners of mineral rights in land overlying said common source of supply. As to the charge that such regulations deprive the individual of property without compensation or due process of law, the defendants very convincingly demonstrate that the enforcement of chapter 59, art. 1, S. L. 1935, though it may reduce the plaintiff's immediate or current receipts from the production of the well in question, yet, in protecting the common source of supply from sporadic drilling, it will tend to prolong his receipts so that their total or his ultimate benefit from said pool will be greater than it would be if the number of wells drilled into the pool were not limited. However, be that as it may, since the plaintiff's mineral deed did not grant him the benefit, use, or possession of any definite amount of minerals nor the right to reduce any certain amount of minerals to possession, but only gave him an ownership in the oil and gas that might be captured or reduced to possession, and since the right to capture from a common source of supply may be limited or restricted by the state, it may be said that such a grant can confer no right or title in property that is not already subject to being limited, restricted, or modified by the state's said power. The extent of private contract in such matters being at all times subject to limitation by the inherent police power of the state, any muniment of title is impotent to assume or to convey any property right in the common source of supply superior to or entirely independent of said sovereign power. Thus, in our opinion, the lawful exercise of the state's power to protect the correlative rights of owners in a common source of supply of oil and gas is not a

proper subject for the invocation of the provisions of either the state or federal Constitution which prohibit the taking of property without just compensation or without due process of law and forbid the impairment of contract obligations. As we view it the property here involved has not been taken or confiscated; its use has merely been restricted and qualified. This does not violate the due process clause of either Constitution. And this would be true even though the plaintiff were able to prove a distinct loss to himself through the operation of the statutes putting said police power into force and effect. In Brown et al. v. Humble Oil & Refining Company, supra, the following words were quoted with approval from Lombardo v. City of Dallas (Tex.) 73 S. W.2d 475:

"All property is held subject to the valid exercise of the police power, nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law."

The plaintiff's contention that the statute in question does not have a uniform operation and therefore violates section 59 of article 5 of the Oklahoma Constitution is made in connection with and based upon his assertion that it allows the taking of private property for private use. As we have found the latter contention ineffective, and we perceive of no other respect in which it might seriously be considered contrary to that section of the Constitution, we conclude that section 59, article 5, is not violated by said act.

Next, we come to the consideration of whether or not the statute in question is a lawful exertion of the state's power to regulate the drilling of oil and gas wells. The plaintiff's contention is that, admitting the state possesses such power, still the act in question is an unlawful use of same, because it violates section 1, article 4, of the Oklahoma Constitution, which provides for the distribution of the powers of the state to the legislative, judicial, and executive branches of its government. In support of this contention, plaintiff's counsel assert that the statute complained of undertakes to delegate to the executive department, acting through the Corporation Commission, an administrative board, the legislative power which, they say, can only be exercised by the Legislature itself. Counsel

recognize the well-settled rule that the Legislature may enact a law, complete within itself, the object of which is a general purpose, and, for the purpose of carrying the act into operation, may delegate to administrative agencies the power to prescribe details in connection with the administration and enforcement of said law. The claim, however, is that the well-spacing act is not complete within itself, as it prescribes no standard by which the Corporation Commission shall be governed in deciding whether or not an area shall be divided into spacing units and what the character of the units shall be, after evidence such as described in subdivision (b), section 4, of the act has been received, and therefore that said law leaves to the commission more than just the details of its administration and enforcement. This argument assumes that the Corporation Commission is nothing more than an administrative body, and herein lies one of its fallacies. By the Constitution itself, the Corporation Commission was granted powers over transportation and transmission companies which are legislative and judicial as well as executive in their nature, and the extension by legislative enactment of the field over which these powers can be exercised is authorized by section 35, article 9, of the Constitution. Russell v. Walker, 160 Okla. 145, 15 P.2d 114. The enactment of statutes such as the one in question cannot be held to violate section 1, article 4, of the Oklahoma Constitution, for said section is inapplicable to the Corporation Commission. In the Russell Case, supra, we said:

"The subject of the first part of article 4, supra, is powers of government. The subject of the second part is departments of government. While it is provided in the second part of the article that the legislative, executive, and judicial departments of government shall be separate and distinct and that neither shall exercise the powers properly belonging to either of the others, those statements are coupled with an exception, as follows, 'except as provided in this Constitution.' One of the exceptions is the Corporation Commission, which, by the provisions of article 9, supra, was vested with legislative, executive, and judicial authority. The provision that the legislative, executive, and judicial departments of government shall be separate and distinct and that neither shall exercise the powers properly belonging to either of the others, by reason of the exception in article 4, supra, is not applicable to the Corporation Commission."

Because of the character of the Corporation Commission's grant of powers by our state Constitution, we must reiterate, with reference to the authorities cited by plaintiff's counsel in this case, what we said in the Russell Case, as follows:

"For that reason the decisions from other states cited by the petitioners are neither persuasive nor controlling, in the absence of a showing that the Constitutions of the states in which those decisions were rendered contained the broad grant of legislative power which is contained in section 35, supra."

All of the cases cited by the plaintiff as authority for his contention have reference to agencies possessing powers of purely administrative character and lack the extraordinary powers granted the Corporation Commission by the Constitution of Oklahoma.

Though we believe in the principle that an act whose enforcement is trusted to any agency of the government should be definite and certain enough to let the agency know what the Legislature intended to provide for and how the legislative will is to be carried out in the administration and enforcement of the act, still we must also recognize that there are certain subjects of legislation in which the application of this principle is necessarily limited. In our estimation, well-spacing is such a subject. We believe it would be impossible for the Legislature to lay down a definite standard by which it could be determined correctly just when and under what conditions an oil-producing area should be divided into drilling units and what size and shape the units should be. The best manner of well-spacing, or a criterion by which this might be arrived at, could not be anticipated or prescribed in advance of the opening of an oil field because of the difference between the conditions in one field and those in another and the variability of the effect which such conditions have upon the objects to be obtained. The impossibility of fixing a definite standard for the administration and enforcement of oil and gas conservation measures has been given great weight in the judicial determinations of their validity in other jurisdictions. See Brown v. Humble Oil & Refining Co., supra, and People v. Associated Oil Co., 211 Cal. 93, 294 P. 717. In the latter of these cases, the court was considering the validity of a statute for the prevention of the waste of natural gas. With reference to the contention that the standard set forth in said act was objectionable on account of its vagueness and uncertainty, the court said:

"Therefore, because of the many and varying conditions peculiar to each reservoir and to each well, which will bear upon a determination of what is a reasonable proportion

of gas to the amount of oil produced, it may be said that it would be impossible for the Legislature to frame a measure based on ratios or percentages or definite proportions which would operate without discrimination, and that what is a reasonable proportion of gas to the amount of oil produced from each well or reservoir is a matter which may be ascertained to a fair degree of certainty in each individual case."

In our opinion the validity of the statute in question should be tested by the rule stated in volume 25 of Ruling Case Law, at page 810, as follows:

"An act will not be declared inoperative and ineffectual on the ground that it furnishes no adequate means to secure the purpose for which it was passed, if men of common sense and reason can devise and provide the means, and all the instrumentalities necessary for its execution are within the reach of those intrusted therewith."

The well-spacing sections of the statute in question are obviously designed to prevent waste by limiting the number of wells drilled into the common source of supply to a number which will enable the recovery of the most oil from said supply. It is a matter of common knowledge that the recovery of oil through a well by the natural process of its own flowing depends upon the lifting power exerted by the pressure of natural gas or water or both in and around the common source of supply or oil-bearing portion of the sand penetrated by the well. This lifting power which brings the oil from its reservoir through the well to the surface is generally known as "reservoir energy" by those conversant with the more or less scientific facts of oil production. Therefore, the amount of oil which can be recovered by the natural flowing of wells from any given reservoir depends upon the amount, character, and availability of said reservoir energy. By mathematical calculation it can be determined to the extent of reasonable certainty just how much pressure is necessary to lift the production of a well to the surface from each particular common source of supply. The amount of reservoir energy, as well as the amount of oil present in a common source of supply, can now be determined to a fair degree of certainty without extensive drilling. Considering these sums together with the amount of energy necessarily expended in bringing said oil to the surface, it can be ascertained how the production should best be regulated to procure the greatest recovery from the common source of supply. Regulation, of course, includes a determination of the location of the wells and the amount of oil each should be allowed to produce, so that the reservoir energy will not be exhausted before all of the recoverable oil is wrested from the common source of supply. In this determination, there are many physical facts of the particular mineral area which must be taken into consideration, such as the character and extent of the reservoir; the dip, depth, thickness, porosity, and permeability of the producing sand; the nature, character, and location of the reservoir energy, etc. Such information can be obtained in advance of the complete development of a given area by geological calculation and correlation upon data compiled from core drilling and seismographing as well as surface surveys and the discoveries made in neighboring wells. In performing its functions as a fact-finding body, the Corporation Commission is empowered by chapter 131, S. L. 1933, and chapter 59, art. 1, S. L. 1935, to take evidence upon all of these subjects and others found by scientific investigation and research to have a bearing upon securing the greatest possible recovery from the common source of supply, and by application of the principles of physics, chemistry, geology, and mathematics, can determine by certain calculations at what intervals of space wells should be located in order to bring about such recovery and thus prevent waste and also protect the correlative rights of all of the owners of interests therein. Such desirable results have not been obtained and cannot be obtained from sporadic drilling. Therefore, since it is a matter of undisputed fact that the kind of well-spacing unit which will induce the greatest recovery from a particular oil and gas reservoir or common source of supply is a matter which can be determined within the limits of human knowledge and to a fair degree of certainty, and since the Corporation Commission has been granted powers withheld from ordinary administrative agencies, which enable it to function as a legislative as well as a judicial and executive body, it follows that the commission within itself, can determine the character of drilling unit best adapted to preserving the reservoir energy and the correlative rights of the owners in a common source of supply, unlimited by standard except the rules of procedure provided and the objects expressed in the two waste-prevention statutes enacted as chapter 131 of the Oklahoma Session Laws of 1933 and chapter 59, art. 1, of the Oklahoma Session Laws of 1935.

The uncertainty and indefiniteness of said statutes is also advanced as a ground for the contention that they violate the due

process clauses of the Oklahoma and United States Constitutions. Plaintiff's counsel refer to the opinion of the United States Supreme Court in the Champlin Case, supra, as if it were authority for their contention. In that case, the court declined to uphold the validity of section 7962, O. S. 1931, which provided a penalty for the violation of other sections of the 1915 waste-prevention statute, because said statute contained no definition of·the term "waste." The rule followed in that instance was quoted from the opinion in Connally v. General Construction Co., 269 U. S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126, as follows:

"* * * That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

In the Champlin opinion, the court further states:

"The general expressions employed here are not known to the common law or shown to have any meaning in the oil industry sufficiently definite to enable those familiar with the operation of oil wells to apply them with any reasonable degree of certainty. The meaning of the word 'waste' necessarily depends upon many factors subject to frequent changes. No act or definite course of conduct is specified as controlling and, upon the trial of one charged with committing waste in violation of the act, the court could not foresee or prescribe the scope of the inquiry that reasonably might have a bearing on or be necessary in determining whether in fact there had been waste. It is no more definite than would be a mere command that wells shall not be operated in any way that is detrimental to the public interest in respect of the production of·crude oil. And the ascertainment of the facts necessary for the application of the rule of proportionate production laid down in sec. 4 (sec. 7957) would require regular gauging of all producing wells in each field, a work far beyond anything that reasonably may be required of a producer in order to determine whether in the operation of his wells he is committing an offense against the act.

"In the light of our decisions, it appears upon a mere inspection that these general words and phrases are so vague and indefinite that any penalty prescribed for their violation constitutes a denial of due process of law. It is not the penalty itself that is invalid, but the exaction of obedience to a rule or standard that is so vague and indefinite as to be really no rule or standard at all."

With reference to counsel's insistence that we apply to the well-spacing sections of the 1935 Act the same rule with reference to indefiniteness and uncertainty that was applied to the penal section of the 1915 Act in the above-quoted opinion, we cannot help but observe that the United States Supreme Court might·have applied the rule to defeat the regulatory provisions of the 1915 law had it found the rule appropriate for such an extensive application. It does not appear from the opinion in the Champlin Case whether or not the specific objection was made to the regulatory provisions of the act, but it is certain that it was there contended that these provisions violated the due process clause, which is the basis of the rule as to indefiniteness and uncertainty, and that contention was not upheld.

In reviewing the history of this constitutional limitation of indefiniteness and uncertainty upon the validity of statutes, we find good reason for a studied· limitation of its application. 45 Harv. L. Rev. 160; 1 Geo. Wash. L. Rev. 114; 8 Wisconsin L. Rev. 176; 11 Tex. L. Rev. 212. The requirement of definiteness and certainty was first applied to criminal statutes only, and though at first it was not based upon any certain constitutional provision, it developed from the rule of construction that penal statutes are to be construed strictly in favor of the accused. See Lewis' Sutherland, Statutory Construction (2d Ed., 1904) chap. XIV. Later, in seeking constitutional basis for this limitation in criminal cases, the Sixth Amendment to the United States Constitution was relied upon, when it was discovered that the accused was not being "informed of the nature and cause of the accusation." Thereafter, in cases brought to test the validity of statutes, under state Constitutions which contained no provision such as the Sixth Amendment to the federal Constitution, due process clauses were used as a basis for holding such statutes unconstitutional. Among the first of these cases was Louisville & Nashville R. Co. v. R. R. Commissioner of Tennessee, 19 Fed. 679, in which a Tennessee statute granting the Railroad Commission of that state the power to fix reasonable railroad rates and providing a penalty for the collection of "unreasonable" rates, was declared invalid. The reason given by the court for declaring

the act unconstitutional on the ground of uncertainty was that the enforcement thereof would result in the delegation to a jury of the power of deciding in a prosecution under the act the unreasonableness of a given rate without any standard having been set forth by the Legislature by which a verdict was to be reached. The rule of uncertainty has also been applied by the United States Supreme Court in the wage scale cases, the most notable of which is Connally v. General Construction Co., supra. However, the application of this rule to such cases has not been universal. See Ruark v. International Union of Operating Engineers, 157 Md. 576, 582, 146 Atl. 797, 799; Campbell v. City of New York, 244 N. Y. 317, 155 N. E. 628, 50 A. L. R. 1473; State v. Tibbetts, 21 Okla. Cr. 168, 205 P. 776. In cases where it would be very difficult to prescribe by a statute a definite standard for its administration, the United States Supreme Court has refused to apply the rule. Examples of this are found in Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, and Mutual Film Corporation v. Industrial Commission of Ohio, 236 U. S. 230, 35 S. Ct. 387. In the Buttfield Case, the court had before it for consideration the constitutionality of a congressional act designed to prevent the importation of impure and unwholesome tea. The act made it unlawful to import to the United States tea which was inferior in purity, quality, and fitness for consumption to the standards fixed by the Secretary of the Treasury. In urging the unconstitutionality of said act, it was argued that this delegation of power to the Secretary of the Treasury was an unconstitutional delegation of legislative power to an administrative official, for it set forth no criterion by which the secretary should be guided in fixing the standards of purity, quality, and fitness by which the tea importations were to be judged. In deciding that this act was not an unlawful delegation of legislative power, the court followed the rule stated in Marshall Field & Co. v. Clark, 143 U. S. 649. 36 L. Ed. 294, 12 S. Ct. 495, and spoke the following:

"We may say of the legislation in this case, as was said of the legislation considered in Marshall Field & Co. v. Clark, that it does not in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the

plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

The above quotation is sufficient to reveal that the courts recognize a very real and practical limit to the degree of definiteness and certainty which can be attained in legislation upon some subjects, and we believe that the matter of well-spacing is one of those subjects.

In the Mutual Film Corporation Case, supra, there was before the court for consideration an Ohio statute, 103 Ohio Laws, p. 399, creating, under the authority and superintendence of the Industrial Commission of that state, a board of censors for motion picture films and providing for the imposition of a penalty for each exhibition of films without the approval of the board, and providing that "only such films as are, in the judgment and discretion of the board of censors. of a moral, educational, or amusing and harmless character shall be passed and approved by such board."

In that case, the court said:

"The objection to the statute is that it furnishes no standard of what is educational, moral, amusing, or harmless, and hence leaves decision to arbitrary judgment, whim, and caprice; or, aside from those extremes, leaving it to the different views, which might be entertained of the effect of the pictures, permitting the 'personal equation' to enter. resulting 'in unjust discrimination against some propagandist film', while others might be approved without question. But the statute by its provisions guards against such variant judgments, and its terms, like other general terms, get **precision from the sense and experience of men**, and become certain and useful guides in reasoning and conduct. **The exact specification of the instances of their application would be as impossible as the attempt would be futile.** Upon such sense, and experience, therefore, the law properly relies. This has many analogies and direct examples in the cases, and we may cite Gundling v. Chicago. 177 U. S. 183. 44 L. Ed. 725, 20 S. Ct. 633; Red 'C' Oil Mfg. Co. v. Board of Agriculture, 222 U. S. 380, 56 L. Ed. 240, 32 S. Ct. 152; Monongahela Bridge Co. v. United States, 216 U. S. 177, 54 L. Ed. 435, 30 S. Ct. 356; Buttfield v. Stranahan. 192 U. S. 470, 48 L. Ed. 525, 24 S. Ct. 349. See, also. Waters-Pierce Oil Co. v. Texas. 212 U. S. 86. 53 L. Ed. 417, 29 S. Ct. 220. If this were not so. the many administrative agencies created by the state and national governments would be denuded of their utility. and government in some of its most important exercises become impossible."

From our review of the decisions of all courts in cases involving statutes alleged to

be too indefinite and uncertain to be valid, we have reached the conclusion that there is irreconcilable conflict of opinion and grave doubt and uncertainty as to the application of the doctrine. To us it seems that the exigencies of the particular case, in the final analysis, has been the controlling factor in such decisions. One thing, of which we are certain, however, is that the reason which brought about the original application of the rule with reference to definiteness and certainty in criminal statutes does not exist in the present case. Here, the liberty or freedom of the person of no one is involved. This case does not invoke a consideration by us of the doctrine of uncertainty as it would be applied to penal statutes as did the Champlin Case, supra, in view of the fact that plaintiff is not being proceeded against under the penal provisions of the 1933 Act. This case merely involves the use of certain alleged property rights of the plaintiff, and in the Well-Spacing Act we believe that the Legislature. has gone as far toward fixing a standard for the regulation of these rights as could be done, considering the nature of the things sought to be regulated and the number and variability of conditions and circumstances which have a bearing upon attaining the expressed objects of the act. It would be impossible for the Legislature to formulate a standard which would justly and equitably measure the application of the principles of well-spacing to every common source of supply, because of the wide variety of factors to be considered, as hereinbefore noted.

Another ground upon which the plaintiff urges that the act violates the due process clauses of our state and federal Constitutions is that no provision is made therein for judicial review of the orders of the commission. The provisions of said law which provide for appeal from the orders of the commission with reference to well-spacing are section 3, chapter 59, art. 1, S. L. 1935, and sections 28, 29, and 30 of chapter 131, S. L. 1933. It is argued that the review provided for in these sections is legislative rather than judicial, and that therefore no judicial review is provided. However, this question, like that of the validity of the penal sections of chapter 131, supra, is not properly before the court at this time. A principle of long standing in constitutional law is that "a court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect and who has therefore no interest in defeating it." See Cooley, Constitutional Limitations (6th Ed.) 196; 11 American

Jurisprudence, 748; 12 C. J 780; Sarlls v. State ex rel. Trimble (Ind.) 166 N. E. 270, 67 A. L. R. 718, 727; State of Minnesota ex rel. Clinton Falls Nursery Co. v. Steel County Board of County Com'rs (Minn.) 232 N. W. 737, 71 A. L. R. 1190; People of State of California v. Irwin L. Perry (Cal.) 298 Pac. 19, 76 A. L. R. 1331, 1336. This principle is applicable to objections to separable portions of an act as well as those to the entire act. See Stine v. Lewis, 33 Okla. 609, 127 P. 396, in which this rule was observed. Constitutional questions are not dealt with abstractly. Bandini Petroleum Co. v. Superior Court, 284 U. S. 8, 76 L. Ed. 136, 52 S. Ct. 103. In Aikins v. Kingsbury, 247 U. S. 484, 38 S. Ct. 558, 62 L. Ed. 1226, the Supreme Court of the United States said:

"He who would successfully assail a law as unconstitutional must come showing that the feature of the act complained of operates to deprive him of some constitutional right."

There it was held:

"A purchaser of public land who offers no excuse for his confessed default is not in a position to challenge the validity of a forfeiture statute on the ground that the omission to provide for a judicial review of the default renders the statute invalid as taking his property without due process of law, since such omission does not injure him, and if supplied would not benefit him."

A consideration by us of the nature of the review provided by the statute in question upon the appeal of orders of the Corporation Commission would have no bearing on the rights of the plaintiff in this action, for no appeal has been taken from the order complained of. Since no attempt has been made to secure an appellate review of said order, it is of no consequence, with reference to the subject matter of this action, whether such review, if invoked, would have been legislative or judicial in its nature. Finding this question purely an abstract one in this case, we decline to consider it here.

As we have found the so-called "Well-Spacing Act," or chapter 131, Session Laws of Oklahoma 1933, as amended by chapter 59, art. 1, Session Laws of Oklahoma 1935, valid in all of the respects that its validity is properly questioned in this case, it is our opinion that the judgment of the trial court should be affirmed, but that the amount thereof should be increased to $872 in conformity with the confession of error filed in this court by the defendants; and it is hereby so ordered.

OSBORN, C. J., BAYLESS, V. C. J., and

RILEY, WELCH, PHELPS, CORN, and HURST, JJ., concur. GIBSON, J., concurs in conclusion.