**HELMERICH & PAYNE, INC., et al.,**
Appellants,

v.

**The CORPORATION COMMISSION of the State of Oklahoma and LVO Corporation, Appellees.**

**No. 46491.**

Supreme Court of Oklahoma.

Feb. 18, 1975.

Barth P. Walker, Oklahoma City, for appellants.

Ferrill H. Rogers, Oklahoma City, for appellees.

C. Harold Thweatt and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, amicus curiae.

DOOLIN, Justice.

The basic issue presented for decision in this case is: whether the Oklahoma Corporation Commission under its regulatory power over oil and gas may order an elec-

tion by lessees or mineral owners to participate in a drilling program or in lieu thereof to accept bonuses or overrides in a nine governmental section unit.

A statement of the salient facts as we view them is in order.

The Corporation Commission, sometimes referred to as Commission, by Order dated November 16, 1972, established 640-acre drilling and spacing units for the production of gas and gas condensate from seven common sources of supply [1] under nine governmental sections of land located in Blaine and Custer Counties, Oklahoma. At a later hearing the Commission issued Order No. 96649 dated March 26, 1973, which is the subject of this appeal; the definitive parts of said order are hereinafter set out.

Within the nine governmental sections the leasehold interests were owned in the approximate amounts as follows:

| Lessee | Net acres | % of ownership |
| --- | --- | --- |
| LVO | 810 | 14.06 |
| Tenneco | 1600 | 27.78 |
| Reading & Bates | 790 | 13.72 |
| Union of Calif. | 1160 | 20.14 |
| ONG | 1040 | 18.05 |
| Mobil | 360 | 6.25 |
| | 5760 | 100.00% |

LVO made the original application asking for an adjudication of the rights and equities and pooling the interests of oil and gas leaseholders, and unleased mineral interests in the seven separate common sources of supply in the nine governmental sections. LVO and its associate, ONG, have interests in all nine governmental sections. The other interests are not as widely held within the nine sections and tend to be concentrated in definite geographical areas: Tenneco to the northwest; Reading & Bates to the northeast; Union of Calif. to the south one-half; and, Mobil scattered.

The definitive parts of the Commission's Order No. 96649 are as follows:

"2. That for the purpose of this Order, the sum of $779,000.00 is fixed as the approximate cost of drilling and completing a unit well to the Hunton Formation, and the sum of $600,000.00 is fixed as the approximate cost of drilling and completing a unit well to the Mississippi-Chester Formation, and in the event there is a dispute as to such cost after any unit well has been completed, the Commission retains jurisdiction of this Cause for the purpose of redetermining such cost; that the sum of $30.00 per acre or no cash bonus but an override of $\frac{1}{16}$ of $\frac{7}{8}$ on oil and $\frac{1}{8}$ of $\frac{7}{8}$ on gas is hereby fixed as a fair and reasonable bonus to be paid any party whose interest is pooled herein in lieu of his right to participate in the working interest of any and all unit wells in which he has an interest.

3. The owner of an outstanding leasehold estate shall be permitted to participate in the working interest of any and all unit wells in which he has an interest by paying his proportionate part of the cost thereof, or furnishing satisfactory evidence for the payment thereof, within 10 days from the date he receives written notice from applicant that a unit well has been commenced; or the owner of such an outstanding leasehold estate may, in lieu of full participation, elect to accept a bonus in cash or an overriding royalty as set out above for any acreage owned in the unit where the first well is drilled, and to participate as to one-third of the acreage owned by him in each and every subsequent well down to the top of the Mississippi-Chester Formation, and as to one-fourth of his acreage as to all formations below the top of the Mississippi-Chester.

4. In the event any owner of an outstanding leasehold estate does not desire to participate in the development of the nine-section area, he shall be awarded a

[1]. Tonkawa, Cottage Grove, Oswego, Cherokee, Murrow, Mississippi-Chester and Hunton—7 separate sources of supply underlying Sections 11, 12, 13, 14, 23 and 24—Twn14N—R14WIM, Custer County; and, Sections 17, 18 and 19—Twn14N—R13WIM, Blaine County, Oklahoma.

bonus, either in cash or in overriding royalty, as set out above, in lieu thereof; and he shall be required to elect within 15 days from the date of this Order whether he desires to accept the bonus herein established for all his interests in any and all of the nine drilling and spacing units, and the type of bonus he elects to receive, or whether he desires to participate in the development program under one of the alternatives set out above. In the event any owner fails to make such an election, his failure to elect shall act as an election to accept the cash bonus of $30.00 per acre for all his interest in the nine drilling and spacing units.

5. Applicant shall commence a well on one of the units within 60 days after the effective date of this Order and shall commence wells on nine units within one year after the effective date of this Order. As to any units upon which a well has not been commenced at the expiration of the one year period, this Order shall be null and void.

6. In the event any unit well is not commenced as provided herein, this Order shall become null and void as to all units except those previously drilled and completed, and the pooling of the outstanding leasehold interest in all of the remaining drilling and spacing units shall be vacated, set aside and held for naught."

The findings of the Commission are likewise innovative.

"7. This is the first application presented to the Commission seeking approval of a comprehensive drilling program comprising several drilling and spacing units, and the simultaneous pooling of the interests in several units in order to carry out the program.

8. In support of the application, it is contended that this type of drilling program will serve to prevent waste and will protect correlative rights in various ways, including the encouragement of exploration for, and development of oil and gas reserves. Applicant points out that in many areas in Oklahoma, including that involved here, a number of lessees frequently own oil and gas leases on portions of a drilling and spacing unit, and on undivided interests in a single tract in the unit. This widely divided ownership serves as a deterrent to voluntary pooling of interests, due to the number of parties necessary to the agreement, and the fact that a development program attractive to one lessee is not always timely or desirable to another.

9. An even greater deterrent to development is the practice of many owners of substantial lease blocks to refuse to join in a wildcat or exploratory well; but if the first well proves successful, then to come forward to participate actively in development wells offering much less risk. Also, after a wildcat well has resulted in discovery of oil or gas, the bonus sought for pooling interests in adjoining drilling and spacing units rises dramatically. Thus, the venturesome oil operator often finds himself penalized for having undertaken the risk of drilling an exploratory well, while those who will not undertake those risks reap rich rewards.

10. The type of drilling program the Commission approves in this Order will have the effect of equalizing the exploratory risks to some degree. The proponent of the drilling program will know accurately the nature and extent of his working interest throughout the development area before he undertakes the risk and expense of an exploratory well. But more important, each participant must make his election under the same status of knowledge; and none will be able to take advantage of the reduced risks that come from the drilling of successfull wells."

As salutory as we think the reasoning and rationale of the Commission's findings and orders to be, and as worthy of consideration, we nonetheless feel that the Commission is bound by the statutory provi-

sions of 52 O.S.1971, § 87.1(d), more specifically the following portion thereof:

"When two (2) or more separately owned tracts of land are embraced within an established spacing unit, or where there are undivided interests separately owned, or both such separately owned tracts and undivided interests embraced within such established spacing unit, the owners thereof may validly pool their interests and develop their lands as a unit. Where, however, such owners have not agreed to pool their interests and where one such separate owner has drilled or proposes to drill a well on said unit to the common source of supply, the Commission, to avoid the drilling of unnecessary wells, or to protect correlative rights, shall, upon a proper application therefor and a hearing thereon, require such owners to pool and develop their lands in the spacing unit as a unit. All orders requiring such pooling shall be made after notice and hearing, and shall be upon such terms and conditions as are just and reasonable and will afford to the owner of such tract in the unit the opportunity to recover or receive without unnecessary expense his just and fair share of the oil and gas. The portion of the production allocated to the owner of each tract or interests included in a well spacing unit formed by a pooling order shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon. Such pooling order of the Commission shall make definite provisions for the payment of cost of the development and operation, which shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, including a reasonable charge for supervision. In the event of any dispute relative to such costs, the Commission shall determine the proper costs after due notice to interested parties and a hearing thereon."

■ We conclude that the right to regulate the production of oil and gas under our statute last mentioned is limited to situations where common rights to drill within an existing spacing unit and separate or undivided ownership exist. Such common rights to drill and ownership exist in a single 640-acre spacing unit in the instant case, not over a nine governmental section area. At the risk of oversimplification, it is the separate or undivided ownership and common right to drill that is the "matrix or glue" of the designated drilling and spacing unit. When the statute says the Commission *shall* require the owners "to pool and develop their lands *in the spacing unit* as a *unit*" it is limiting pooling within the designated drilling and spacing unit of 640 acres. Further limitation exists in the statute when it provides regulation of separate ownership "embraced within an established spacing unit" or "where undivided interests (are) separately owned" or both conditions exist;— "within *such established spacing unit.*"

Not because the orders and findings of the regulatory body are innovative and fresh do we disapprove, but because we feel the regulatory statute is restrictive.

We do not infer or by this holding mean that a valid contract or agreement to share costs, information, a farm-out, make contribution, etc., cannot be entered into by any number of operators, lessors, mineral holders, or other interested parties in an area—provided, such an agreement does not contravene or ignore the statutory provisions against waste, or conservation.

■ The power to regulate the production of gas and oil is derived from the police power. Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83, appeal dismissed, 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231 (1939); Palmer Oil Corporation v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997, appeal dismissed, 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022 (1951); Champlin Refining Co. v. Corporation Commission of the State of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1931).

In H. F. Wilcox Oil & Gas Co. v. State, 162 Okl. 89, 19 P.2d 347, 350, 86 A.L.R.

421 (1933), we stated the authority of the Corporation Commission is limited as follows:

> "This court has sustained the authority of the corporation commission to enforce the statutes of Oklahoma with reference to proration of oil, but this court cannot sustain the action of the corporation commission when it exercises authority not granted to it by those statutes, . . . ."

Since we hold the Corporation Commission exceeded its authority under 52 O.S.1971, § 87.1 by issuing its Order No. 96649, we find it unnecessary to turn to the additional points raised by the parties on appeal and express no opinion as to such matters.

We feel constrained to note that Appellees' relief and authority for their theory lies with legislative enactment, not with the Court.

Order No. 96649 vacated; cause reversed.

All Justices concur.