**NORTH AMERICAN ROYALTIES, INC., Appellant,**

v.

**The CORPORATION COMMISSION OF OKLAHOMA and Dyco Petroleum Corporation, Appellees.**

No. 58146.

Court of Appeals of Oklahoma, Division No. 4.

Feb.· 28, 1984.

Rehearing Denied March 29, 1984.

Certiorari Denied June 19, 1984.

Released for Publication by Order of Court of Appeals June 25, 1984.

**540**

Max H. Lawrence, Ames, Daugherty, Black, Ashabranner, Rogers & Fowler, Oklahoma City, for appellant.

James W. George, James W. George & Associates, Oklahoma City, for appellee Dyco Petroleum Corporation.

### OPINION ON REHEARING

DeMIER, Presiding Judge.

The earlier opinion rendered in this case and published at 54 O.B.J. 2739 (1983), is hereby withdrawn and the following opinion is issued in its place.

### FACTS

Appellee, Dyco Petroleum Corporation, presented an application to the Oklahoma Corporation Commission for a pooling order covering the common sources of supply underlying Section 14, Township 15 North, Range 26 West in Roger Mills County. This application was dated September 15, 1981.

Dyco's application was set for hearing before a trial examiner on November 20, 1981. All notice requirements were met and the hearing held on the date set.

Appellant, North American Royalties, Inc., was one of the parties holding a leasehold interest in Section 14. North American had been given actual notice of the hearing. North American chose not to appear.

On January 20, 1982, the Corporation Commission issued Order No. 206888, which authorized Dyco to drill and operate the unit well for the development of Section 14. The order went on to provide:

"3. To enable the unit well to be drilled, to avoid the drilling of unnecessary wells and to protect correlative rights, each owner must elect, within 15 days from the date of this order, one of the following alternative methods of effecting the committing of his or its interest in the unit well.

"3.1 *Participate.* To participate in the drilling of the unit well. Any owner who elects to participate in the drilling of the unit well shall be required to pay to Applicant his or its pro rata share of actual costs of drilling, completing and equipping the unit well and, in the event of production, of all actual operating costs, plus a reasonable charge by Applicant for supervision. Any owner who elects to participate shall pay, within 20 days from the date of this order, all of such owner's pro rata share of the estimated completed well costs as set out in paragraph 2 above, or, within 20 days from the date of this order, furnish evidence satisfactory to Applicant, of such owner's ability to pay such estimated costs. Provided, however, in the event any owner who makes a timely election to participate fails, within said period of 20 days, to pay to Applicant, or to furnish evidence satisfactory to Applicant of such owner's ability to pay, such owner's share of the estimated costs, the previous election to participate by such owner shall be considered void and such owner shall be treated as if he or it had made no election, as set forth in paragraph 4 below.

"3.2 *Cash Bonus Plus Reserved Overriding Royalty.* To relinquish his or its working interest to Applicant for a cash bonus of $500 per mineral acre covered by the relinquished interest plus a reserved overriding royalty equalling $\frac{1}{16}$ of $\frac{8}{8}$ of all oil and all gas, said fractional overriding royalty to be reduced, however, to absorb any now existing non-op-erating interests in excess of the normal $\frac{1}{8}$ lessor's royalty; provided, however, this option shall not be available to any owner whose working interest is burdened with non-operating interests in excess of $\frac{3}{16}$ of all oil and gas; or

"3.3 *Reserved Overriding Royalty.* To relinquish his or its working interest to Applicant for a reserved overriding royalty equalling $\frac{1}{16}$ of $\frac{7}{8}$ of all oil and $\frac{1}{8}$ of $\frac{7}{8}$ of all gas, said fractional overriding royalty to be reduced, however, to absorb any now existing non-operating interests in excess of the normal $\frac{1}{8}$th lessor's royalty."

A copy of the order was mailed to North American on January 22, 1982. North American did not elect to participate, and, as North American's interest was burdened with non-operating interests in excess of $\frac{3}{16}$ ths of all oil and gas, by operation of the order, relinquished its working interest to Dyco under the terms set forth in paragraph 3.3.

North American did not seek a rehearing before the Corporation Commission. Instead, on February 19, 1982, North American filed a petition in error in the supreme court for review of Order No. 206888. In this petition North American alleged that it had been deprived of its working interest without compensation and that Order No. 206888 thus violated provisions of the constitutions of both the United States and the State of Oklahoma.

I

In its argument to this court North American initially maintains that the procedure before the Corporation Commission resulted in a deprivation of its rights to substantive due process. North American concedes that the procedure was such as to meet all requirements necessary to guarantee procedural due process. The argument, thus, is that North American's interest was, in its opinion, undervalued. North American argues that this undervaluation resulted in a deprivation of property without compensation.

The Oklahoma forced pooling statute, under which Order No. 206888 was generated, has routinely been held to be constitutional, and the burden of showing an unconstitutional application in this case rests upon appellant. *Sellers v. Corporation Commission*, Okl., 624 P.2d 1061 (1981). Appellant has failed to meet this burden. The Supreme Court of Oklahoma, in the case of *Patterson v. Stanolind Oil & Gas Co.*, 182 Okl. 155, 77 P.2d 83 (1938), *appeal dismissed*, 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231 (1939), stated:

> "Thus, in our opinion, it is well established that the police power of the state extends to protecting the correlative rights of owners in a common source of oil and gas supply and this power may be lawfully exercised by regulating the drilling of wells into said common source of supply and distributing the production thereof among the owners of mineral rights in land overlying said common source of supply.... The extent of private contract in such matters being at all times subject to limitation by the inherent police power of the state, any muniment of title is impotent to assume or to convey any property right in the common source of supply superior to or entirely independent of said sovereign power. Thus, in our opinion, the lawful exercise of the state's power to protect the correlative rights of owners in a common source of supply of oil and gas is not a proper subject for the invocation of the provisions of either the State or Federal Constitution which prohibit the taking of property without just compensation or without due process of law and forbid the impairment of contract obligations. As we view it, the property here involved has not been taken or confiscated: its use has merely been restricted and qualified. This does not violate the due process clause of either Constitution. And this would be true even though the plaintiff were able to prove a distinct loss to himself through the operation of the statutes putting said police power into force and effect. In *Brown et al. v. Humble Oil & Refining Company*, supra [126

Tex. 296, 83 S.W.2d 935 (1935)], the following words were quoted with approval from *Lombardo v. City of Dallas*, 124 Tex. 1, 73 S.W.2d 475, 478 [1934]:

> "'All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law.'"

■ The Corporation Commission's duty in this case was to set a just and reasonable amount of compensation to be paid to those working interest owners who did not wish to participate in the drilling of the unit well. The measure of this compensation is the fair market value of the interest. *Miller v. Corporation Commission*, Okl., 635 P.2d 1006 (1981). The Commission took evidence in this case of the fair market value of a normal working interest in Section 14. The evidence in the record supports the valuation set by the Commission. North American's interest, however, was burdened with excess overriding royalties granted out of that interest which impaired the fair market value of the interest retained.

■ North American complains that, in effect, it is now getting nothing for its interest. Presumably North American received some benefit in exchange for the overrides granted which impaired the market value of the interest it retained. North American also had the opportunity under the order to elect to participate in the unit well. By the exercise of that option appellant would have retained its full working interest. North American's contention that it was deprived of substantive due process in this case is without merit.

## II

Appellant also argues that Order No. 206888 forces it to assume the responsibili-

ty for the excess overrides granted by it out of its working interest. In support of its contention that such a result is erroneous appellant cites the case of *O'Neill v. American Quasar Petroleum Co.*, Okl., 617 P.2d 181 (1980).

 We would agree with appellant that *O'Neill* would preclude such a result. We find, however, that appellant's argument is based upon a misunderstanding of Order No. 206888. Appellant argues that the language in paragraph 3.3 which states that "said fractional overriding royalty to be reduced, however, to absorb any now existing non-operating interests in excess of the normal ⅛th lessor's royalty," requires that appellant be responsible for the payment of the excess non-operating interests. While such a result may be fair where, as here, a lessee has unduly burdened its working interest and then abandoned it in a forced pooling proceeding, it is simply not the meaning of the order. The order states that the unit operator's obligation to pay the override granted in exchange for the working interest pooled is to be reduced to absorb the amount of excess burdens previously granted from that interest. This provides the mechanism to relieve the unit operator of the onus of giving the same consideration for an overburdened working interest as for an unburdened interest.

This result is made clear by the court's statement in *O'Neill*, 617 P.2d at 185:

"However, the overrides do not come from the original lessee's interest when he chooses not to participate but are attributable to the unit operator. The statute specifies that overriding royalties, production payments, royalties in excess of ⅛th, or other obligations shall be paid by the lessee out of his share of the working interest.... The statute provides the excess royalty is to be paid by the lessee out of his working interest. Under the last quoted statutory provision (52 O.S.1971 § 87.1(d)) when an owner of a working interest elects not to participate in a unit well, electing rather to accept a bonus or royalty in lieu thereof, that working interest becomes the prop-erty of a person authorized to drill the well, and that unit operator is required to pay the bonus. *Youngblood v. Seewald*, 299 F.2d 680 (Okl. 10 Cir.1961)...."

The Commission's order must be read in the context of the statutory authority underlying the Commission's actions. When this is done, any possible merit in appellant's argument dissolves.

The Corporation Commission order appealed from is hereby affirmed.

BRIGHTMIRE and STUBBLEFIELD, JJ., concur.